**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROL LESH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABLE NEWS NETWORK, INC.,<br><br>Defendant. | Case No. 1:24-cv-03132-VM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carol Lesh ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Cable News Network, Inc. ("Defendant" or "CNN") owns and operates a website, cnn.com (the "Website").

2.      When users visit the Website, Defendant causes three Trackers—the PubMatic Tracker, Rubicon Tracker, and Aniview Tracker (collectively, the "Trackers")—to be installed on Website visitors' internet browsers.  Defendant then uses these Trackers to collect Website visitors' IP addresses.

3.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b); s*ee also Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA section 638.51.

## PARTIES

6.      Plaintiff Lesh resides in Berkeley, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff Lesh was in California when she visited the Website.

7.      Defendant CNN is a Delaware corporation with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

9.      This Court has specific jurisdiction over Defendant because Defendant maintains an office in New York and therefore availed itself of the privileges of New York law, and Plaintiff's claims arise from or relate to these contacts.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### I.   THE CALIFORNIA INVASION OF PRIVACY ACT

11.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

12.    As relevant here, CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

13.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

14.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

15.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

16.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace

devices" to record the numbers of incoming calls to that particular telephone line.  As technology advanced, however, courts have expanded the application of these surveillance devices.

17.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

18.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also Greenley*, *supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

19.     Individuals may bring an action against the violator of any provision of CIPA— including CIPA section 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.    DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A.    The Trackers Are "Pen Registers"

20.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored.  In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.  *See* Figure 1.

**Figure 1:**



21.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

22.    In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address—to PubMatic, Magnite, and Aniview.

23.    The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

24.     Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location.

25.     Through an IP address, the device's state, city, and zip code can be determined.

26.     Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.  Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[1]

27.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[2] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[3]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[4] *because* "[c]ompanies can use an IP address … to personally identify individuals."[5]

28.     For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis.[6]  Or, for a job fair in specific city, companies can send advertisements to

---

[1]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA, https://www.accudata.com/blog/ip-targeting/.

[2]  *Location-based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[3] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[4] *IP Targeting: Understanding This Essential Marketing Tool*.

[5] Trey Titone, *The future of IP address as an advertising identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[6] *See, e.g.*, *IP Targeting: Understanding This Essential Marketing Tool*.

only those in the general location of the upcoming event.[7]

29.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[8]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[9]

30.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[10]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[11]

31.     As alleged below, Defendant installs each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Trackers are each "pen registers."

 1.     *PubMatic Tracker*

32.     PubMatic is a software-as-a-service company that develops the PubMatic Tracker, which it provides to website owners like Defendant for a fee.

33.     According to PubMatic, it is "one of the world's leading scaled digital advertising platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and

---

[7] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns (last visited April 24, 2024).

[8] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*.

[9] *Id.*

[10] *Id.*

[11] *Id.*

data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[12]

34.     In other words, PubMatic enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, PubMatic uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

35.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the PubMatic Tracker on the user's browser.  The PubMatic Tracker, in turn, instructs the user's browser to send PubMatic the user's IP address.

36.     Moreover, PubMatic stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the PubMatic Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the PubMatic Tracker causes the browser to send the cookie along with the user's IP address to PubMatic.  A general diagram of this process is pictured as Figure 2, which explains how the Website causes the PubMatic Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address through the cookie.  *See* Figure 2.

//

//

//

---

[12] *The Supply Chain Of The Future.  Delivered*, PᴜʙMᴀᴛɪᴄ, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

**Figure 2**:



37.     If the user clears his or her cookies, then the user wipes out the PubMatic Tracker

from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins

over again: (i) Defendant's server installs the PubMatic Tracker on the user's browser, (ii) the

PubMatic Tracker instructs the browser to send PubMatic the user's IP address, (iii) the PubMatic

Tracker stores a cookie in the browser cache, and (iv) PubMatic will continue to receive the user's

IP address on subsequent Website visits as part of the cookie transmission.  *See* Figure 3.

//

//

//

//

//

//

//

//

//

//

**Figure 3**:



38.    The PubMatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra,* 2023 WL 4833466, at *15.

39.    Further, the PubMatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *See, e.g., James v. Walt Disney Co.,* --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

40.    Because the PubMatic Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA section 638.50(b).

2.      *Rubicon Tracker*

41.      Magnite, Inc. ("Magnite") is a software-as-a-service company that develops the Rubicon Tracker, which it provides to website owners like Defendant for a fee.

42.      According to Magnite, it "is the world's largest independent sell-side advertising company.  Publishers use [their] technology to monetize their content [and] [t]he world's leading agencies and brands trust [Magnite's] platform to access … billions of advertising transactions each month."[13]

43.      In other words, Magnite enables companies to sell advertising space on their websites, thereby earning revenue, and allows companies to place advertisements on other companies' websites, thereby driving brand awareness and sales.  To achieve this, Magnite uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

44.      Similar to above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Rubicon Tracker on the user's browser.  The Rubicon Tracker, in turn, instructs the user's browser to send Magnite the user's IP address.

45.      Moreover, Magnite stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Rubicon Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Rubicon Tracker causes the browser to send the cookie along with the user's IP address to Magnite.  A

---

[13] *iHeartMedia and Magnite Unify Access to Broadcast and Digital Audio, Providing Advertisers with a Direct Path to Premium Inventory*, MAGNITE (Jan. 9, 2024), https://investor.magnite.com/news-releases/news-release-details/iheartmedia-and-magnite-unify-access-broadcast-and-digital-audio.

general diagram of this process is pictured as Figure 2, which explains how the Website causes the Rubicon Tracker to install a cookie on the user's browser instructs the user's browser to send the user's IP address through the cookie.  *See* Figure 2.

46.     If the user clears his or her cookies, then the user wipes out the Rubicon Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the Rubicon Tracker on the user's browser, (ii) the Rubicon Tracker instructs the browser to send Magnite the user's IP address, (iii) the Rubicon Tracker stores a cookie in the browser cache, and (iv) Magnite will continue to receive the user's IP address on subsequent Website visits as part of the cookie transmission.  *See* Figure 4.

**Figure 4:**



47.     The Rubicon Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, *supra,* 2023 WL 4833466, at *15.

48.     Further, the Rubicon Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James, supra,* --- F. Supp. 3d ---, 2023 WL 7392285, at *13.

49.     Because the Rubicon Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA section 638.50(b).

       3.    *Aniview Tracker*

50.     Aniview Inc. ("Aniview") is a software-as-a-service company that develops the Aniview Tracker, which it provides to website owners like Defendant for a fee.

51.     According to Aniview, it "is a global adtech and media company whose platform is playing an increasingly central role in delivering efficient and effective video advertising across the open web."[14]

52.     Just like PubMatic and Magnite, Aniview uses its Tracker to receive, store, and analyze data collected from website visitors, such as visitors of Defendant's Website.

53.     As discussed above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the Aniview Tracker on the user's browser.  The Aniview Tracker, in turn, instructs the user's browser to send the user's IP address to Aniview.

54.     Moreover, Aniview stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Aniview Tracker locates the

---

[14] *About Us*, ANIVIEW, https://www.aniview.com/about (last visited Jan. 18, 2024).

cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Aniview

Tracker causes the browser to send the cookie along with the user's IP address to Aniview.  A

general diagram of this process is pictured as Figure 2, which explains how the Website causes the

Aniview Tracker to install a cookie on the user's browser instructs the user's browser to send the

user's IP address through the cookie.  *See* Figure 2.

55.     If the user clears his or her cookies, then the user wipes out the Aniview Tracker

from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins

over again: (i) Defendant's server installs the Aniview Tracker on the user's browser, (ii) the

Aniview Tracker instructs the browser to send Aniview the user's IP address, (iii) the Aniview

Tracker stores a cookie in the browser cache, and (iv) Aniview will continue to receive the user's

IP address on subsequent Website visits as part of the cookie transmission.  *See* Figure 5.

//

//

//

//

//

//

//

//

//

//

//

//

**Figure 5:**



56.     The Aniview Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, *supra*, 2023 WL 4833466, at *15.

57.     Further, the Aniview Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, *supra*, 2023 WL 7392285, at *13.

58.     Because the Aniview Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA section 638.50(b).

**B.     Defendant Installed And Used The Trackers On Plaintiff's And Users' Browsers Without Prior Consent Or A Court Order**

59.     Defendant owns and operates the Website.  The Website "is the world leader in online news and information and seeks to inform, engage and empower the world."[15]  The Website provides news on politics, business, finance, technology, sports, national and international affairs, as well as op-eds, entertainment information, and short films.

60.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[16]

61.     Often times, third-party scripts are installed on websites "for advertising purposes."[17]

62.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[18]

63.     Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

64.     As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.

---

[15] *About CNN Digital*, CNN, https://www.cnn.com/about (last visited Jan. 18, 2024).

[16] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…") (last visited Jan. 19, 2024).

[17] *Id.*

[18] *Id.*

65.    Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the IP address of visitors to the Website, including the IP address of Plaintiff and Class Members. *See* Figures 6 (PubMatic Tracker), 7 (Rubicon Tracker), and 8 (Aniview Tracker).

**Figure 6**:



**Figure 7**:



**Figure 8:**



66.     Defendant then uses the IP address of Website visitors, including those of Plaintiff and Class Members, to serve targeted advertisements and conduct website analytics.

67.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

### C.     Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy

68.     The collection of Plaintiff's and Class Members' personally identifying, non-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

69.     As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

> 1.   *Defendant Uses The PubMatic Tracker For The Purposes Of Marketing, Advertising, And Analytics*

70.     PubMatic describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[19]

71.     PubMatic helps companies like Defendant market, advertise, and analyze user data from its website.  For example, PubMatic enables publishers to place advertisements on their webpages to further monetize their websites.[20]  To ensure that an effective advertisement is shown to the consumer, the publisher shares data about the user with PubMatic and PubMatic serves the targeted ad.[21]

72.     PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs" and "reach [their] target audiences more effectively."[22]  One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[23]  In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

---

[19] *The Supply Chain Of The Future.  Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

[20] *Future Of Monetization.  Build For You.*, PUBMATIC, https://pubmatic.com/solutions/publishers (last visited Jan. 18, 2024).

[21] *Id.*

[22] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages (last visited Jan. 18, 2024).

[23] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

73.     By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[24]  This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[25]

74.     In other words, when users visit Defendant's Website, PubMatic collects users' IP addresses through its PubMatic Tracker to so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

   2.     *Defendant Uses The Rubicon Tracker For The Purposes Of Marketing, Advertising, And Analytics*

75.     Magnite is a digital advertising platform that helps companies like Defendant market, advertise, and analyze user data from its website.

76.     Similar to PubMatic, Magnite enables publishers to place advertisements on their webpages to further monetize their websites.  To ensure that an effective advertisement is shown to the consumer, the publisher shares data about the user with Magnite and Magnite serves the targeted ad.[26]

---

[24] *Connect With PubMatic's Auction Packages: Ramadan*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

[25] *Id.*

[26] *Sellers*, MAGNITE, https://www.magnite.com/sellers/ (last visited Jan. 18, 2024).

77.     Magnite also "help[s] [advertisers] reach more of the audiences [they] care about, more efficiently than ever" with targeted ads.[27]   Using Magnite's technology, companies can "[r]each [their] target wherever [the targets] are in their day (and in the world)."[28]

78.     Magnite enables companies to target specific people through their Custom Auction Packages, which "[l]everage behavior and context by bringing [] first and third-party data, or by using open-market seller data to build [data sets]" identifying targets.[29]

79.     In order to perform the functions listed above, Magnite needs to collect data that identifies a particular user.   This is why Magnite collects IP addresses: it allows Magnite to ascertain a user's location and target that user with advertisements tailored to their location, as well as to track a user's Website activity over time (*i.e.*, through repeated Website visits) to target a user with advertisements relevant to the user's personal browsing activity.

80.     In other words, when users visit Defendant's Website, Magnite collects users' IP addresses through its Rubicon Tracker so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.   All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

---

[27] *Buyers*, MAGNITE, https://www.magnite.com/buyers/ (last visited Jan. 18, 2024).

[28] *Id.*

[29] *Id.*

3.   *Defendant Discloses User's Data To Aniview For The Purpose Of Marketing, Advertising, And Analytics*

81.    Aniview describes itself as a video monetization platform that "powers the most efficient & effective advertising across the open web with unrivaled product versatility, operating transparency & customer support."[30]

82.    Aniview helps companies like Defendant market, advertise, and analyze user data from its website, specifically for video content.  For example, Aniview enables publishers to place advertisements in videos or embedded in broadcasts.  To ensure that an effective advertisement is shown to the consumer, the publisher shares data about the user with Aniview and Aniview serves the targeted ad.[31]

83.    Aniview also helps advertisers select where to place their ads with a "vast supply of advertising space from publishers around the world" and enables companies to "use advance targeting" to "reach ideal customers."[32]  In other words, Aniview utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

84.    In other words, when users visit Defendant's Website, Aniview collects users' IP addresses through its Aniview Tracker so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

---

[30] ANIVIEW, https://aniview.com (last visited Jan. 19, 2024).

[31] *Selling Your Inventory Is A Breeze*, ANIVIEW, https://Aniview.com/marketplace/publishers (last visited Jan. 19, 2024).

[32] *Join Our Ad Marketplace For Advertisers*, ANIVIEW, https://aniview.com/marketplace/advertisers (last visited Jan. 19, 2024).

## PLAINTIFF'S EXPERIENCE

85.    Plaintiff regularly visits the Websites on her desktop browser—sometimes multiple times a day—and has done so throughout the entirety of the class period.

86.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  Defendant, PubMatic, Magnite, and Aniview, then used the Trackers to collect Plaintiff's IP address.  *See* Figures 9 (PubMatic Tracker), 10 (Rubicon Tracker) and 11 (Aniview Tracker).  Notably, with the PubMatic and Magnite Trackers (Figures 9-10), Plaintiff's IP address is used to ascertain her location as Santa Clara, California, along with specific latitude-longitude coordinates and a zip code.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

**Figure 9:**



**Figure 10:**



**Figure 11**:



87.     Defendant, PubMatic, Magnite, and Aniview used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's location, and ultimately boost Defendant's and advertisers' revenue.

88.     Plaintiff did not provide her prior consent to Defendant to install or use the Trackers on Plaintiff's browser.

89.     Defendant did not obtain a court order before installing or using the Trackers.

90.     Plaintiff has, therefore, had her privacy invaded by Defendant's violations of CIPA § 638.51(a).

## CLASS ALLEGATIONS

91.     Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

92.     The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

93.     **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the

individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

94.     **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)     Whether Defendant violated CIPA section 638.51(a);

(b)     Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(c)     Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(d)     Whether Defendant sought or obtained a court order for its use of the Trackers; and

(e)     Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

95.     **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had her IP address collected by the Trackers, which were installed and used by Defendant.

96.     **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

97.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

98.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

99.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

100.     CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

101.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or

electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

102.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. (Cal. Penal Code § 638.50(b).)

103.    At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP addresses.

104.    The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website.  *In re Zynga Privacy Litig.,* 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

105.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

106.    Defendant did not obtain a court order to install or use the Trackers.

107.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)     For pre- and post-judgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

(g)     For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: June 14, 2024                     Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Yitzchak Kopel*
        Yitzchak Kopel

Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email:  ykopel@bursor.com
             aleslie@bursor.com
             mroberts@bursor.com

*Attorneys for Plaintiff*