**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROL LESH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABLE NEWS NETWORK, INC.,<br><br>Defendant. | Case No. 1:24-cv-03132-VM<br><br>Hon. Victor Marrero |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE**

Dated: September 6, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Defendant Has Not Established That Plaintiff Consented To The Terms Of Use ..... 2

A. Defendant's Extrinsic Documents Should be Disregarded ..... 3

B. Substantively, Defendant Has Failed to Establish Consent ..... 6

II. Plaintiff Has Stated A Claim Under CIPA Section 638.51 ..... 10

A. Section 638.51 Applies To Internet-Based Communications ..... 10

B. Plaintiff Has A Legally Protected Interest In Her IP Address ..... 15

C. CNN's "User" Argument Has No Merit ..... 21

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alicia T. v. Cnty. of Los Angeles*,
222 Cal. App. 3d 869 (Ct. App. 1990) .......... 14

*Benson v. Double Down Interactive, LLC*,
798 F. App'x 117 (9th Cir. 2020) .......... 9

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 9

*Boelter v. Hearst Communications, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016) .......... 18

*Calhoun v. Google, LLC*,
2024 WL 3869446 (9th Cir. Aug. 20, 2024) .......... 3, 4

*Capitol Records Inc. v. Thomas-Rasset*,
2009 WL 1664468 (D. Minn. June 11, 2009) .......... 19

*Carpenter v. United States*,
585 U.S. 296 (2017) .......... 12

*Columbia Pictures Industries v. Bunnell*,
2007 WL 2080419 (C.D. Cal. May 29, 2017) .......... 19

*Doe v. Meta Platforms, Inc.*,
2023 WL 5837443 (N.D. Cal. Sept 7, 2023) .......... 13

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) .......... 11

*Georgiadis v. First Boston Corp.*,
1992 WL 51500 (S.D.N.Y. Mar. 9, 1992) .......... 23

*Giant Grp., Ltd. v. Sands*,
142 F. Supp. 2d 503 (S.D.N.Y. 2001) .......... 3

*Gladstone v. Amazon Web Services, Inc.*,
2024 WL 3276490 (W.D. Wash. July 2, 2024) .......... 13

*Greenley v. Kochava*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 12, 20

*Gruber v. Yelp Inc.*,
55 Cal. App. 5th 591 (2020) .......... 22

*Halaburda v. Bauer Pub. Co.*,
2013 WL 4012827 (E.D. Mich. Aug. 6, 2013) .......... 18

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) .......... 19

*Hesse v. Godiva Chocolatier, Inc.*,
463 F. Supp. 3d 453 (S.D.N.Y. 2020) .......... 4

*Hines v. Overstock.com, Inc.*,
668 F. Supp. 2d 362 (E.D.N.Y 2009) .......... 6

*In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority*,
396 F. Supp. 2d 747 (S.D. Tex. 2005) .......... 15

*In Re Application of the U.S. of Am. for an Order Authorizing the Use of a Cellular Tel. Digit. Analyzer*,
885 F. Supp. 197 (C.D. Cal. 1995) .......... 15

*In re Broadcast.com, Inc.*,
2001 WL 36050382 (E.D. Tex. Dec. 12, 2001) .......... 22

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 13

*In re DoubleClick Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .......... 23

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 17

*In re Facebook Internet Tracking Litig.*,
140 F. Supp. 3d 922 (N.D. Cal. 2015) .......... 11

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) .......... 16

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 11

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 2, 7

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ............ 7, 11

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ............ 6

*Ladore v. Sony Computer Entertainment America, LLC*,
75 F.Supp.3d 1065 (N.D. Cal. 2014) ............ 4

*Licea v. Hickory Farms LLC*,
2024 WL 1698147 (Cal. Super. Ct. Los Angeles Cnty. Mar. 13, 2024) ............ 14, 19

*Licea v. Hickory Farms LLC*,
2023 WL 11113637 (Cal. Super. Dec. 4, 2023) ............ 19

*Licea v. Vitacost.com, Inc.*,
683 F. Supp. 3d 1118 (S.D. Cal. 2023) ............ 11

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ............ 13

*Madhu v. Socure Inc.*,
693 F. Supp. 3d 405 (S.D.N.Y. 2023) ............ 3

*Malibu Media, LLC v. Pontello*,
2013 WL 12180709 (E.D. Mich. Nov. 19, 2013) ............ 19

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ............ 11

*Meyer v. Uber Technologies, Inc.*,
868 F.3d 66 (2d Cir. 2017) ............ 3

*Moody v. C2 Educational Systems Inc.*,
2024 WL 3561367 (C.D. Cal. July 25, 2024) ............ 12, 15

*Mount v. PulsePoint, Inc.*,
684 F. App'x 32 (2d Cir. 2017) ............ 16

*Murray v. National Association of Realtors*,
2023 WL 7726173 (E.D. Mich. Nov. 15, 2023) ............ 17

*My Health, Inc. v. Gen. Elec. Co.*,
2015 WL 9474293 (W.D. Wis. Dec. 28, 2015) ............ 5

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........................................................................ 6, 9

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
495 F. Supp. 3d 257 (S.D.N.Y. 2020) ................................................................ 3

*Price v. Carnival Corp.*,
2024 WL 221437 (S.D. Cal. Jan. 19, 2024) ..................................................... 8, 9

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ..................................................... 13

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ........................................................................ 1, 11, 17, 19

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) ........................................................................... 3

*Sparshott v. Feld Ent., Inc.*,
311 F.3d 425 (D.C. Cir. 2002) ........................................................................ 22

*Specht v. Google Inc.*,
747 F.3d 929 (7th Cir. 2014) ........................................................................... 5

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989) ...................................................................................... 17

*United States v. Bansal*,
663 F.3d 634 (3d Cir. 2011) ............................................................................ 5

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ..................................................................... 12, 16

*United States v. Hernandez*,
2020 WL 3257937 (S.D.N.Y. June 16, 2020) .................................................... 20

*United States v. Hutchins*,
361 F. Supp. 3d 779 (E.D. Wis. 2019) ............................................................. 13

*United States v. Jean*,
207 F. Supp. 3d 920 (W.D. Ark. 2016) ............................................................. 21

*United States v. Kidd*,
394 F. Supp. 3d 357 (S.D.N.Y. 2019) ............................................................... 20

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) ........ 12, 16

*United States v. Stuart*,
2024 U.S. Dist. LEXIS 30650 (W.D.N.Y. Feb. 22, 2024) ........ 20

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) ........ 12, 16

*William Gottlieb Management Co. v. Carlin*,
2024 WL 1311854 (S.D.N.Y. Mar. 26, 2024) ........ 23

*Yockey v. Salesforce, Inc.*,
2024 WL 3875785 (N.D. Cal. Aug. 16, 2024) ........ 13

**STATUTES**

18 U.S.C. § 2701(c)(2) ........ 23

18 U.S.C. § 3127(3) ........ 15

Cal. Pen. Code § 350 ........ 10

Cal. Pen. Code § 350(b) ........ 10

Cal. Pen. Code § 351(a) ........ 10

Cal. Pen. Code § 629.51(a) ........ 10

Cal. Pen. Code § 630 ........ 1

Cal. Pen. Code § 638.50 ........ 10, 12, 15

Cal. Pen. Code § 638.50(b) ........ 15

Cal. Pen. Code § 638.50(c) ........ 16

Cal. Pen. Code § 638.51 ........ 20, 23

Cal. Pen. Code § 638.51(b) ........ 21

Cal. Pen. Code § 638.52(h) ........ 15

Cal. Pen. Code § 638.52(i) ........ 15

Cal. Pen. Code § 638.52(j) ........ 15

Cal. Pen. Code § 1546(e) ........ 21

Cal. Pen. Code § 1546(j) ........ 21

**RULES**

Cal. R. Ct. 8.1115(a) ........ 14

Fed. R. Evid. 201 ........ 4

Fed. R. Evid. 602 ........ 5

Fed. R. Evid. 901 ........ 5

Fed. R. Evid. 901(b)(1) ........ 5

Plaintiff Carol Lesh ("Plaintiff") respectfully submits this Opposition to Defendant Cable News Network, Inc.'s ("CNN" or "Defendant") Motion to Dismiss and/or Strike (ECF No. 33) (hereinafter, the "Motion" or "MTD").

## INTRODUCTION

When the California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"), it recognized "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. Further, as the California Supreme Court has held, the intent of the CIPA is to protect the right of Californians to control who does and does not get to learn personal information about them:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.
>
> …
>
> [S]uch secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (cleaned up).

This is the privacy right Defendant breached here. Specifically, when Plaintiff visited Defendant's website, cnn.com (the "Website"), Defendant caused third party trackers operated by PubMatic, Magnite, and Aniview to be installed on Plaintiff's and Class Members' web browsers (the "Trackers"). First Amended Complaint (ECF No. 25) ("FAC") ¶¶ 32-58, 63-67. Defendant's conduct caused Plaintiff's and Class Members' personal information—their IP addresses—to be

sent to third parties, improperly and without consent. *Id*. An IP address is personal information because it discloses a user's location, which users retain the right to choose who knows and who does not. *Id.* ¶¶ 23-31. Further, Defendant's installation of these third-party trackers is not innocuous. Instead, when the Trackers received Plaintiff's and Class Members' IP addresses, it used this information to bolster Defendant's marketing, advertising, analytics, and revenue-generating efforts. *Id.* ¶¶ 31, 69, 74, 80. Plaintiff alleges Defendant's conduct violates CIPA § 638.51, which prohibits the unconsented-to installation and use of "pen registers" and "trap and trace devices."

Though Defendant raises a bevy of legal arguments in its Motion, not once does Defendant dispute the underlying conduct: that Defendant installed Trackers that disclosed users' IP addresses to third parties, and did so for marketing, advertising, and revenue-generating purposes. For the reasons set forth below, each of Defendant's arguments is without merit. The Motion should be denied.

## ARGUMENT

### I. DEFENDANT HAS NOT ESTABLISHED THAT PLAINTIFF CONSENTED TO THE TERMS OF USE

Throughout its brief, Defendant has scattered arguments based on Plaintiff's supposed consent to its Terms of Use ("TOUs"). First, Defendant asserts that Plaintiff's claims are barred by a choice of law provision in the terms of use. MTD at 9. Next, Defendant claims that Plaintiff consented to the use of the trackers. MTD at 19-20. Finally, Defendant moves to dismiss or strike the class allegations of the Complaint, based on the argument that Plaintiff assented to the class action waiver in the TOUs. MTD at 22-24. All of these contentions reduce to the same argument: that Plaintiff consented to CNN's terms of use and privacy policy. It is Defendant's burden to demonstrate Plaintiff consented to any terms of use or privacy policy. *Jackson v. Amazon.com,*

*Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) ("Under California law and generally applicable principles of contract law, the burden is on Amazon as the party seeking arbitration to show that it provided notice of a new TOS and that there was mutual assent to the contractual agreement to arbitrate."); *Calhoun v. Google, LLC*, --- F.4th ---, 2024 WL 3869446, at *5 (9th Cir. Aug. 20, 2024) ("[C]onsent is an affirmative defense for which defendant bears the burden of proof.") (cleaned up).[1] Defendant cannot do so.

### A. Defendant's Extrinsic Documents Should be Disregarded

"In reviewing a motion to dismiss under Rule 12(b)(6), review must be limited to the complaint and documents attached or incorporated by reference thereto. Courts must accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Giant Grp., Ltd. v. Sands*, 142 F. Supp. 2d 503, 505 (S.D.N.Y. 2001) (cleaned up). Attempting to establish an affirmative defense of consent, Defendant has submitted a declaration attaching a number of exhibits purporting to be screenshots of its TOUs, Privacy Policy, and popup banners. *See* Declaration of Blake J. Steinberg (ECF No. 34) ("Steinberg Decl."). This submission does not meet the requirements for judicial notice. Accordingly, Plaintiff respectfully submits it is improper for the Court to consider any part of these documents in connection with the Motion to Dismiss.

Extrinsic documents can be considered on a motion to dismiss if they have been incorporated by reference into the complaint or are integral to it. *Madhu v. Socure Inc.*, 693 F.

---

[1] "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). However, New York law cannot apply at this juncture "given that the very validity of the underlying contracts at issue." *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 284 n.12 (S.D.N.Y. 2020).

Supp. 3d 405, 417 (S.D.N.Y. 2023). Here, the Complaint does not refer to or rely on the documents CNN has submitted, nor has Defendant even argued that it has done so. Extrinsic documents are also sometimes permitted on a motion to dismiss when the defendant makes a request for judicial notice and the documents meet the criteria, but Defendant has not requested judicial notice of the documents. Defendant has simply submitted them as if this were an evidentiary motion.

Even if Defendant had properly filed a request for judicial notice, the documents are not judicially noticeable. Under Fed. R. Evid. 201, a court may take judicial notice only of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Courts have specifically declined to take judicial notice of Terms of Service submitted under similar circumstances. *See, e.g. Ladore v. Sony Computer Entertainment America, LLC*, 75 F.Supp.3d 1065, 1074 (N.D. Cal. 2014) (refusing to take judicial notice of defendant's Terms of Service and/or Software Licenses because documents not the type whose "accuracy cannot be reasonably questioned."). While courts may occasionally take judicial notice of a website, they may do so only where its authenticity is not questioned. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) ("Plaintiffs here do not challenge the authenticity of these documents, so the Court takes judicial notice of them. ").

Plaintiff does challenge the authenticity of these documents. Consent is an affirmative defense for which defendant bears the burden of proof. *Calhoun*, 2024 WL 3869446, at *5. Defendant cannot carry this burden because it has failed to authenticate or lay a foundation of personal knowledge with respect to the exhibits to the Steinberg Declaration (as well as for the substantive reasons discussed in the following section). The declarant is an associate attorney with Defendant's outside law firm. Steinberg Decl. ¶ 1. The declaration does not state he has

knowledge of the documents' origins or how they are maintained. *See generally* Steinberg Decl. Nothing in the declaration establishes that the documents are what they purport to be. They are therefore not authenticated under Fed. R. Evid. 901. Furthermore, under Fed. R. Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Here, the declarant does not even provide a boilerplate averment that he has personal knowledge of the facts. *See generally* Steinberg Decl.

These failures are especially acute with respect to the pages retrieved from the Wayback Machine. In *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011), the Third Circuit upheld the trial court's admission of Wayback Machine screenshots:

> [t]o authenticate that the screen-shot was what it purported to be, the government called a witness to testify about how the Wayback Machine website works and how reliable its contents are. The witness also compared the screenshots with previously authenticated and admitted images from Bansal's website and concluded, based upon her personal knowledge, that the screenshots were authentic. This was evidence sufficient to support a finding that the screenshots were what they purported to be, rendering them admissible under Rule 901(b)(1).

*Id.* at 668 (cleaned up); *see also Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014) ("[T]he district court reasonably required … authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved.").

Defendant has done none of this. *See* Steinberg Decl. The Court should thus not consider the documents. *See My Health, Inc. v. Gen. Elec. Co.*, 2015 WL 9474293, at *3–4 (W.D. Wis. Dec. 28, 2015) (where unauthenticated Wayback Machine screenshots were proffered, "[t]he court will not take judicial notice of information established by submissions that require authentication").

### B. Substantively, Defendant Has Failed to Establish Consent

Even if the Court were to consider Defendant's improper submission (and it should not), Defendant fails to show that Plaintiff consented to the TOUs or Privacy Policy. Defendant relies entirely on the existence of a popup banner (also called a "cookie banner") on the Website. Defendant contends:

> [i]n late 2022 and early 2023, including on January 25, 2023, the CNN website displayed a pop-up notifying users that they were agreeing to CNN's Terms of Use … Specifically, this pop-up stated that by using the CNN sites and/or maintaining your account, you agree to our updated Terms of Use, including an updated arbitration clause. By clicking X, you acknowledge you have read and agreed to the updated Terms … This pop-up persisted until website visitors clicked X, confirming they had read and agreed to the Terms.

MTD at 4-5 (cleaned up). Defendant has not met its burden to show Plaintiff's consent to Defendant's practices or terms such as the choice of law provision or anti-class-action provision.

*First*, the cookie banner alone cannot constitute consent because that would be an unenforceable browsewrap agreement that is insufficient for inquiry notice. *Keebaugh v. Warner Bros. Ent. Inc.,* 100 F.4th 1005, 1014 (9th Cir. 2024); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 368 (E.D.N.Y 2009), *aff'd*, 380 F. App'x 22 (2d Cir. 2010). Thus, Defendant must show that the cookie banner was present on the website when Plaintiff visited it *and* that she clicked on it. *Keebaugh,* 100 F.4th at 1014. Defendant has shown neither.

Defendant has submitted no evidence whatsoever that the cookie banner appeared on its home page at any time that Plaintiff visited the website; Defendant simply conjectures when Plaintiff's visits must have occurred. MTD at 4. Speculation does not equal fact. Furthermore, Defendant claims (unsupported by admissible evidence) that the popup notifying users that they were agreeing to the TOU was displayed "in late 2022 and early 2023," MTD at 4, but does not

state when that display ended. If Plaintiff's visits all took place after the popup was no longer displayed, then Defendant's consent argument fails instantly. Defendant also claims (with the same evidentiary deficiencies) that it used similar popups in 2015, 2016, 2017, 2018, and 2019, but is curiously silent about 2020 and 2021. MTD at 6. Again, Defendant has not tied these dates to Plaintiff's visits, nor can it at this stage of the litigation.

Moreover, because Defendant has failed to show that the cookie banner appeared when Plaintiff visited the website, it necessarily fails to show that the cookie banner appeared the first time she did so, or that it appeared instantly when she first visited. CIPA requires prior consent, meaning Defendant was required to obtain Plaintiff's consent to the TOUs and Privacy Policy the first time she visited the Website, and before the Trackers were installed on her web browser. After-the-fact consent to the practice is insufficient. *See Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) ("[W]e conclude the California Supreme Court would interpret [another section of CIPA] to require the prior consent of all parties to a communication."). Defendant provides nothing to show that she consented before her IP address was collected.

*Second*, Defendant relies heavily on the alleged facts that (1) the popup "persisted until an individual clicked an "X' button" to close it and that (2) the banner stated that "By clicking 'X', you acknowledge you have read and agreed to the updated Terms." MTD at 8. But a user is *not required* to click "X" to continue using or navigating the Website,[2] nor does Defendant submit evidence that Plaintiff ever clicked the "X," as is Defendant's burden. *See Jackson*, 65 F.4th at 1100 ("It was Amazon's burden to show assent, not Jackson's to show lack thereof."). Because a

[2] This is confirmable by visiting any of the (non-noticeable) links in the Steinberg Declaration, all of which allow a user to navigate the Website without closing or interacting with the pop-up.

user is not required to close the pop-up, and because Defendant *cannot* show Plaintiff closed the pop-up herself, Defendant cannot show Plaintiff assented to the TOUs or privacy policy.

*Third*, the cookie banner is not sufficient to provide Plaintiff with notice of the choice of law provisions, the class action waiver, or Defendant's installation of the Trackers, or to establish Plaintiff's assent to the same. In *Price v. Carnival Corp.*, --- F. Supp. 3d ---, 2024 WL 221437, at *4 (S.D. Cal. Jan. 19, 2024), the defendant argued the plaintiff consented to a violation of CIPA where a "Cookie Policy banner inform[ed] users that Carnival uses cookies to personalize content and ads, to provide social media features and to analyze Carnival's traffic" and "[t]he banner includes a hyperlink, that users may click to view Carnival's privacy policy." (Cleaned up). The court found the cookie banner was an unenforceable browsewrap agreement and therefore did not suffice for consent:

> Here, the Cookie Policy banner, is visible to a user without scrolling. However, the text of the banner is smaller than the rest of the bold, large typeface found on Carnival's homepage, the notice is placed far below the relevant buttons that a user may click, the blue of the banner matches the blue of other web panels, and the white text of the banner blends in with the website's white background. Additionally, Carnival has not demonstrated that the banner appears immediately or that the banner persists for the entirety of a user's visits. Taken together, these facts do not demonstrate that a "reasonably prudent user" would be on inquiry notice of the terms of Carnival's Privacy Policy.
>
> A user may be distracted by the large red buttons inviting them to "SHOP NOW" or "SEARCH CRUISES" and never view the slim banner across the bottom of their screen. A user may click one of these large, red buttons before the Cookie Policy banner appears, and the banner may fail to appear on subsequent pages. Whether because of the notice's small text, inconspicuous color scheme, or potential failure to appear, a reasonably prudent user would not necessarily have known or learned of the existence of Carnival's privacy agreement prior to acting.

*Id.*, at *5 (cleaned up). So too here. The banner is in a black box with white text in the lower left corner of the page, while the rest of the page is a bright white background with photographs, large headlines, underlined text, and a "trending" bar across the top of the page in red. *See*, *e.g.*, Steinberg Decl. Ex. A. The banner also appears at "the bottom of the page ... where users are unlikely to see it." *Nguyen*, 763 F.3d at 1177. And, as discussed above, Defendant has not demonstrated "the banner appears immediately or that the banner persists for the entirety of a user's visits" *Price*, 2024 WL 221437, at *5), nor has Defendant shown that Plaintiff (or any user) was required to click on the banner to navigate the Website, much less that she, in fact, did click on the banner. A loitering button without an action taken to accept the terms is not sufficient for consent. *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) (declining to enforce arbitration agreement where "Hernandez and Russell did not take any action that unambiguously manifested their assent to be bound by the terms and conditions").

*Finally*, Defendant focuses on Plaintiff's allegation that "she regularly visited the website." MTD at 7. But "[r]epeated use of a website or mobile application does not contribute to constructive notice because users are no more likely to stumble upon inconspicuous hyperlinks on their hundredth or thousandth visit than they are on their first." *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117, 119-20 (9th Cir. 2020).

For each of these reasons, Defendant has not met its burden to show Plaintiff consented to the TOUs or the Privacy Policy. Therefore, Defendant's arguments as to choice of law, the class action waiver, and consent each fail.

## II. PLAINTIFF HAS STATED A CLAIM UNDER CIPA SECTION 638.51

### A. Section 638.51 Applies To Internet-Based Communications

Defendant argues "Plaintiff has failed to plausibly allege that CNN violated Section 638.51 because she does not allege she used a *telephone* to access the CNN website." MTD at 11 (emphasis in original). That is wrong.

*First*, none of the relevant statutory provisions limit the prohibitions of CIPA § 638.51 to telephones or telephone lines, much less even refer to telephones or telephone lines. California Penal Code section 638.50 defines a "pen register" as:

> a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.

Cal. Pen. Code § 350(b). Cal. Pen. Code § 350(a) ascribes "wire communication" and "electronic communication" the same meanings as in Cal. Pen. Code § 629.51(a), which defines the terms as follows:

> (1) "Wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a like connection in a switching station), furnished or operated by any person engaged in providing or operating these facilities for the transmission of communications.
>
> (2) "Electronic communication" means any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system…

Cal. Pen. Code § 629.51(a). And, Cal. Penal Code § 351(a), which Plaintiff alleges Defendant has violated, provides:

> Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53.

*Second*, the Ninth Circuit has explained "[t]hough written in terms of wiretapping, [CIPA] applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *see also*, *e.g.*, *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 936 (N.D. Cal. 2015) (noting that courts have "squarely rejected" the argument that CIPA "should be narrowly construed and should not be applied to electronic communications").

This holding comports with the broad definition of "pen register" as well as with the California Supreme Court's propensity to "regularly read[] statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013). And it comports with the fact that "the California legislature intended for CIPA to establish broad privacy protections [which] supports an expansive reading of the statute." *Id.*; *see also Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) ("In enacting [CIPA], the Legislature declared in broad terms its intent to protect the right of privacy of the people of this state from what it perceived as a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society.") (cleaned up). "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (citing *Ribas*, 38 Cal. 3d at 360-61).[3]

[3] By contrast, when the California Legislature has desired to limit the scope of CIPA to telephone communications, it has done so by stating that a given provision is limited to communications passing over "telegraphic or telephone" wires, lines, or cables. *See*, *e.g.*, *In re Google Inc.*, 2013 WL 5423918, at *20 (referencing the first clause of CIPA § 631(a), and distinguishing same from other clauses that do not include this limitation), *Licea v. Vitacost.com, Inc.*, 683 F. Supp. 3d 1118, 1124 (S.D. Cal. 2023) (discussing CIPA § 632.7, which governs "Cordless or cellular radio telephones").

In line with these principles, courts have regularly applied CIPA to computer-based internet wiretapping, including the pen register statute. *Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (noting "the Court cannot ignore the expansive language in the California Legislature's chosen definition" in finding software was a "pen register"); *Moody v. C2 Educational Systems Inc.*, 2024 WL 3561367, at *2-3 (C.D. Cal. July 25, 2024) (finding software "embedded in the Website ... fall[s] within the scope of §§ 638.60 and 638.51" because "Section 638.50 simply refers to devices or processes that record or capture certain information from a wire or electronic communication") (cleaned up).[4]

Similarly, even if this Court looks to the federal equivalent of the California pen register statute, the Second Circuit recognizes the "recording of IP address … [is] precisely analogous to the capture of telephone numbers." *United States v. Ulbricht*, 858 F.3d 71, 97 (2d Cir. 2017), *abrogated on other grounds*, *Carpenter v. United States*, 585 U.S. 296 (2017); *see also United States v. Soybel*, 13 F.4th 584, 594 (7th Cir. 2021) ("[A]n IP pen register is analogous in all material respects to a traditional telephone pen register."); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("[T]he surveillance techniques [or recording IP addresses] are constitutionally indistinguishable from the use of a pen register that the Court [has] approved."). This is because an IP address "reveal[s] the existence of connections between communications devices without disclosing the content of the communication." *Ulbricht*, 858 F.3d at 97; *see also Forrester*, 512

[4] Defendant argues *Greenley* supports its arguments rather than Plaintiff's because *Greenley* involved a mobile device rather than a computer. MTD at 12. That is wrong. The case involved a mobile application using internet connectivity on the mobile device, and the pen register at issue was software. *Greenley*, 684 F. Supp. 3d at 1037. *Greenley*'s holding did not rest on the fact the user was using a telephone. *See Moody*, 2024 WL 3561367, at *2 ("Defendant argues that *Greenley* is inapposite because it involved software installed on a telephone, not on a website. However, Defendant fails to explain why the definitions under § 638.50 should be so limited given their references to 'wire or electronic communication.'").

F.3d at 510 ("IP addresses constitute addressing information and do not necessarily reveal any more information about the underlying contents of the communication than do phone numbers").

Notably, defendants have long made the same argument that both federal and state wiretapping statutes only apply to telephonic equipment or physical devices and do not apply to software. Yet "[t]he majority of courts to consider this issue have entertained the notion that software may be considered a device for the purpose of the [Federal] Wiretap Act" and its state law equivalents, including the CIPA. *United States v. Hutchins*, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) (collecting cases); *see also*, *e.g.*, *Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2024 WL 3875785, at *7 (N.D. Cal. Aug. 16, 2024) ("The Court agrees with those Ninth Circuit district court decisions that have found that software qualifies as a device under Section 632."); *Gladstone v. Amazon Web Servs., Inc.*, --- F, Supp. 3d ---, 2024 WL 3276490, at *8 (W.D. Wash. July 2, 2024) ("[T]he Court finds that 'device,' as used in Section 632, can include software."); *Doe v. Meta Platforms, Inc*. 2023 WL 5837443, at *7 (N.D. Cal. Sept 7, 2023) ("I agree that the Pixel software is a device under [CIPA] section 632(a)."); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) ("Plaintiffs have sufficiently alleged that the Carrier IQ Software is a 'device' for purposes of the Wiretap Act."); *Revitch*, 2019 WL 5485330, at *3 (under CIPA § 635, finding "NaviStone's code is a device … primarily or exclusively designed or intended for eavesdropping upon the communication of another.") (cleaned up); *Luis v. Zang*, 833 F.3d 619, 634 (6th Cir. 2016) (holding plaintiff plausibly alleged that computer software was "a device … primarily useful for [] the surreptitious interception of [] electronic communications" under Federal Wiretap Act) (cleaned up). Given the federal pen register statute is part of the Electronic Communications Privacy Act (*i.e.*, the Federal Wiretap Act), and the California pen register statute

is part of the broader CIPA, there is no reason to reach a different conclusion here than courts interpreting wiretap acts at large.

Against this weight of authority, Defendant cites *Licea v. Hickory Farms LLC*, 2024 WL 1698147 (Cal. Super. Ct. Los Angeles Cnty. Mar. 13, 2024). *Licea* is an unpublished decision of the California Superior Court (*i.e.* the trial court). Such decisions are not citable in California courts and have no precedential value. *See* Cal. R. Ct. 8.1115(a). In fact, citing an unpublished case in California courts, unless the opinion meets a narrow set of criteria not applicable here, can be sanctionable. *See*, *e.g.*, *Alicia T. v. Cnty. of Los Angeles*, 222 Cal. App. 3d 869, 885 (Ct. App. 1990), modified (Aug. 16, 1990) (sanctions imposed where, among other misconduct, "the T. family's counsel cited the unpublished case eight times in the reply brief and discussed it for four pages."). Regardless, any value of *Licea* as authority is limited by the fact the plaintiff in that case "conclusively ple[d] the pen register claim via parroting" *Greenley*, including by failing to allege "how Plaintiff's information was acquired, including initiation from a visit to the Hickory Farm website, and whether any protocols were violated from said visit." *Licea*, 2024 WL 1698147, at *3-4. This is not a mistake Plaintiff makes here, as she includes robust allegations regarding how each Tracker installed by Defendant captures users' IP addresses, how that data is shared with third parties, and why that violates CIPA. *See* FAC ¶¶ 1-5, 20-58, 64-67, 68-90. Thus, *Licea* should be disregarded as a decision based on the plaintiff's failure to put forth anything more than conclusory allegations.

*Third*, Defendant argues because CIPA § 638.52(c), which provides the requirements for law enforcement officers to obtain a warrant for a pen register, says "telephone number" in several places, CIPA § 638.51 must be read as limited to telephone lines. MTD at 13. The *Moody* court rejected this exact argument, holding "[t]hough § 638.52 refers to pen registers and trap and trace

devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement." Furthermore, Defendant neglects to point out that the *same statute* includes this language: "[u]pon the presentation of an order … *a provider of wire or electronic communication service* … shall immediately provide the peace officer all information, facilities, and technical assistance necessary to accomplish the installation of the pen register." Cal. Pen. Code § 638.52(h) (emphasis added); *see also* Cal. Pen. Code §§ 638.52(i)-(j) (same). This language is not limited to providers of "telephone" services, but rather clearly encompasses other "wire or electronic communication services."

*Finally*, Defendant cites *In Re Application of the U.S. of Am. for an Order Authorizing the Use of a Cellular Tel. Digit. Analyzer*, 885 F. Supp. 197, 200 (C.D. Cal. 1995) ("*In re Application*") for the proposition that the pen register statute applies "only to devices attached to telephone lines." MTD at 14. The *Moody* court rejected this argument too, holding "this case concerned federal law, not California law," "this case, though persuasive, does not foreclose the possibility that software may qualify as a pen register or trap and trace device under California law." *Moody*, 2024 WL 3561367, at *2. Moreover, the language cited in *In re Application*—18 U.S.C. § 3127(3)—has since been amended to broaden the scope of pen registers to new forms of technology. The definition of "pen register" under the amended statute is now virtually identical to the broad definition of "pen register" in CIPA. *Compare* Cal. Pen. Code § 638.50(b) *with* 18 U.S.C.A. § 3127(3); *see also In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority*, 396 F. Supp. 2d 747, 761 (S.D. Tex. 2005).

### B. Plaintiff Has A Legally Protected Interest In Her IP Address

Defendant next argues Plaintiff has no claim under CIPA § 638.51 because she "does not have a legally protected privacy interest in her IP address." MTD at 17. But "[i]n an era when

millions of Americans conduct their affairs increasingly through electronic devices, the assertion [Defendant] makes—that federal courts are powerless to provide a remedy when an internet company surreptitiously collects private data—is untenable." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("*In re Google*"); *see also Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 34 (2d Cir. 2017) ("PulsePoint's alleged unauthorized accessing and monitoring of plaintiffs' web-browsing activity implicates harms similar to those associated with the common law tort of intrusion upon seclusion so as to satisfy the requirement of concreteness.").

*First*, the Second Circuit instructs the "recording of IP address … [is] precisely analogous to the capture of telephone numbers." *Ulbricht*, 858 F.3d at 97; *see also Soybel*, 13 F.4th at 594 (7th Cir. 2021) ("[A]n IP pen register is analogous in all material respects to a traditional telephone pen register."); *Forrester*, 512 F.3d at 510 (noting "the surveillance techniques [or recording IP addresses] are constitutionally indistinguishable from the use of a pen register that the Court [has] approved"). This is because an IP address "reveal[s] the existence of connections between communications devices without disclosing the content of the communication." *Ulbricht*, 858 F.3d at 97; *see also Forrester*, 512 F.3d at 510 ("IP addresses constitute addressing information and do not necessarily reveal any more information about the underlying contents of the communication than do phone numbers").[5]

[5] Defendant briefly asserts that a website visitor's IP address "is not analogous to the collection of phone numbers a caller dialed" because the user's "IP address at most reflects the source of a communication." MTD at 18. Even if Defendant were correct (it is not), this would just mean a Tracker is a "trap and trace device" because it collects "electronic or other impulses that identify the originating … routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication." CIPA § 638.50(c). An IP address fits within this definition for the same reasons set forth above. Regardless, pen registers and trap and trace devices are almost always used together, and thus, courts generally discuss them as one. *See*, *e.g.*, *Soybel*,

*Second*, it should be undisputed that a person has a privacy interest in their location, which is exactly what an IP address divulges. *See also Murray v. National Association of Realtors*, 2023 WL 7726173, at *5 (E.D. Mich. Nov. 15, 2023) ("[A] person may retain a privacy interest in information that is public in some other form because both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or his person.") (cleaned up). Indeed, even if Plaintiff permitted Defendant to know her location, that does not mean she gave the same permissions to undisclosed third parties. This tracks the understanding of the Supreme Court and the Ninth Circuit, among others, which have explained "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or his person." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989); *see also In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 598 ("A right to privacy encompasses the individual's control of information concerning his or his person.") (cleaned up); *Ribas*, 38 Cal. 3d at 361 (1985) (noting CIPA was enacted to protect "the right to control the nature and extent of the firsthand dissemination of [] statements"). Thus, Plaintiff retained the right to choose who to share her location vis-à-vis her IP address with, a right that Defendant breached through its installation and use of the Trackers. By doing so, Defendant impeded Plaintiff's right to privacy and thus violated the CIPA.

*Third*, outside of her privacy interests, Defendant's conduct injured Plaintiff in a different manner. As alleged in the Complaint, the IP address was used for marketing and analytics purposes. FAC ¶ 31. Plaintiff alleges the collection of an IP address enables advertisers to target customers by locations as granular as a zip code, and to target specific households, business, and

---

13 F.4th at 586 n.2 ("For the sake of simplicity, we use the term "pen register" to refer to both [pen registers and trap and trace devices].").

individuals with relevant advertising. *Id.* ¶ 27. And Defendant causes this collection to occur through the installation of the pen registers to "analyze [Defendant's] Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue." *Id.* ¶ 69; *see also id.* ¶¶ 70-84. All of this is done without the user's consent. *Id.* ¶¶ 67, 88, 105. Thus, Plaintiff was also injured by Defendant profiting off her personal information. *Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427, 438 (S.D.N.Y. 2016) ("Plaintiffs allege that Defendant disclosed protected information about Plaintiffs in two ways: by selling it to third parties, and by providing it to 'data mining' companies who then supplemented it with additional data to enhance the value of the information for Defendant"); *Halaburda v. Bauer Pub. Co.*, 2013 WL 4012827, at *8 (E.D. Mich. Aug. 6, 2013) ("[P]laintiffs have pleaded that defendants engaged in collection and illegal disclosure of their personal reading information, and that the monetary and other benefits associated with such disclosure represents unjust enrichment of defendants.").

In addition, Defendant asserts "CIPA's pen register provision [] cannot apply to collection of website visitors' IP addresses" because an IP address is necessarily provided to the website operator upon a user's visit. MTD at 18. This is a red herring. Plaintiff's claim is *not* that her IP address was disclosed to Defendant. Instead, Plaintiff's claim is that Defendant installed a "pen register" (the Tracker) on her browser, which caused Plaintiff's IP address to be sent to a *third party*. There is nothing "necessary" about disclosing Plaintiff's IP address to third parties who use the information for marketing, advertising, and data analytics. As the California Supreme Court has held:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.

*Ribas*, 38 Cal. 3d at 360-61.

For this reason, Defendant's cited authorities are all unpersuasive. *E.g.*, *Capitol Records Inc. v. Thomas-Rasset*, 2009 WL 1664468, at *3 (D. Minn. June 11, 2009) (holding "the Pen Register Act cannot be intended to prevent individuals who receive electronic communications from recording the IP information *sent to them*") (emphasis added); *Malibu Media, LLC v. Pontello*, 2013 WL 12180709, at *4 (E.D. Mich. Nov. 19, 2013) (IP address was sent to a party to the communication, not a third party); *Columbia Pictures Industries v. Bunnell*, 2007 WL 2080419, at *11 (C.D. Cal. May 29, 2017) (the defendant's website itself was the recipient of the IP address, not a third party).

Further, in *Licea v. Hickory Farms LLC*, 2024 WL 1698147 (Cal. Super. March 13, 2024), the plaintiff did not allege the defendant shared his IP address with a third party. First Amended Complaint, *Licea v. Hickory Farms LLC*, Case No. 23STCV26148, 2023 WL 11113637 (Cal. Super. Dec. 4, 2023). Instead, the plaintiff alleged the defendant "knowingly and intentionally deployed a software device" on to its own website for its own "identity resolution efforts." *Id.* ¶ 17. Thus, the *Licea* court reasoned there was "consent under the guise of visiting a website," because the defendant could not otherwise be able to host a website. *Licea*, 2024 WL 1698147, at *4. Moreover, as discussed above, the deficiency of the claim was the result of a "conclusively pled complaint." *Id.* Similarly in *Casillas v. Transitions Optical, Inc.*, No. 23STCV30724 (Cal. Super. April 23, 2024) (Steinberg Decl., Ex. N), the plaintiff alleged the defendant "deployed tracking software" on its own website and, "at most, allege[d] in a conclusory manner" that defendant installed a pen register. Here, however, Plaintiff alleges Defendant installed a pen register that disclosed his information *to a third party*. *See*, *e.g.*, FAC ¶ 22. CNN's reference to *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) is misplaced for the same

reasons, as the plaintiff alleged that "Facebook collected plaintiffs' IP addresses … when they were using [] Facebook." Thus, unlike here, Facebook was a first-party recipient, not a third party receiving IP addresses. *Heeger* is therefore inapplicable.

Next, Defendant attempts to erroneously distinguish *Greenley v. Kochava*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023). There, the defendant was a data broker that provided software developer kits ("SDK") to software developers to assist in developing apps. *Id.* at 1035. Defendant coded its SDK for data collection and embedded it in mobile applications, the SDK collected app users' data, and then the defendant sold that data to clients for advertising purposes. *Id*. CNN argues this case is distinguishable because the *Greenley* defendant was a third-party data broker that provided the software to developers, whereas, here, CNN merely owns and operates the Website. MTD at 18. But the third parties here, like the *Greenley* defendant, used the improperly-collected user information for marketing, advertising, or data analytics purposes without the users' consent. And the pen register statute penalizes those who *install* or use pen registers, which Defendant did. Cal. Penal Code § 638.51(a); *see also* FAC ¶¶ 12, 22, 31. Third-party code does not appear on the Website by accident—it must be affirmatively placed on the Website and programmed by Defendant. *See id*. Moreover, the fact that *Greenley* allegedly involved cell-site location data ("CSLI") is inapposite (MTD at 19), as nowhere does the *Greenley* court discuss if the data collected is CSLI or whether that fact played any significance in its decision.

*Finally*, Defendant's cases involving the permissibility of collecting IP addresses under the Fourth Amendment by law enforcement are irrelevant. MTD at 16-17 (citing *United States v. Hernandez*, 2020 WL 3257937 (S.D.N.Y. June 16, 2020), *United States v. Kidd*, 394 F. Supp. 3d 357 (S.D.N.Y. 2019), and *United States v. Stuart*, 2024 U.S. Dist. LEXIS 30650, at *8 (W.D.N.Y. Feb. 22, 2024)). Those cases miss the mark because there is a Federal Pen Register Act that

expressly permits law enforcement officials—but not others, like the third parties (PubMatic, Magnite, and Aniview) here—to collect IP addresses. *See*, *e.g.*, *United States v. Jean*, 207 F. Supp. 3d 920, 932 (W.D. Ark. 2016) ("a pen register … does not require a warrant to install" by law enforcement). Based on this, it is clear Congress believed that persons do indeed have a reasonable expectation of privacy in their IP addresses and from preventing the disclosure of their IP addresses to non-law enforcement individuals or companies.

### C. CNN's "User" Argument Has No Merit

CNN claims that under CIPA § 638.51(b)(5), only its own consent was needed for the pen registers to be installed on Plaintiff's and class member's browsers. MTD 21. This argument contradicts the text of CIPA, which provides:

> (b) *A provider of electronic or wire communication service* may use a pen register or a trap and trace device for any of the following purposes:
>
> …
>
> (5) If the consent of the user of that service has been obtained.

Cal. Pen. Code § 638.51(b) (emphasis added). So, Defendant's consent is only valid if the third party trackers are providers of electronic communications services. While CIPA does not define "electronic communications service provider," California's Electronic Communications Privacy Act does define both "electronic communications service" and "service provider":

> "Electronic communication service" means a service that provides to its subscribers or users the ability to send or receive electronic communications, including any service that acts as an intermediary in the transmission of electronic communications, or stores electronic communication information.
>
> "Service provider" means a person or entity offering an electronic communication service.

Cal. Penal Code §§ 1546(e), 1546(j). This term plainly refers to companies like Verizon or

Cablevision that provide access to the Internet, and *only* such companies can use pen registers with the consent of their users. By contrast, PubMatic, Magnite, and Aniview, which are third parties that provide marketing and advertising services (FAC ¶¶ 32-34, 41-43, 50-52, 70-84), are neither "provid[ing] … the ability to send or receive electronic communications" or "act[ing] as an intermediary in the transmission of electronic communications." Thus, because the third party Trackers are not providers of an electronic communication service, whether Defendant consented to their conduct is immaterial. Similarly, Defendant is a news organization that provides a website and is not an "electronic communications service provider." *In re Broadcast.com, Inc.*, 2001 WL 36050382, at *3 (E.D. Tex. Dec. 12, 2001) ("Broadcast.com operates a website and, in doing so, does not provide Internet access to the public. It uses it.").[6]

Defendant claims "CNN uses the Internet to host the CNN.com website" means that Defendant is the "user" of an "electronic communication service," and its consent to the Trackers is sufficient. MTD at 21-22. As an initial matter, if a website could absolve itself of privacy-breaching conduct simply by using the Internet, the exception would swallow the rule. The exception would also contravene CIPA's express, two-party consent language. *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 607 (2020) ("[CIPA] prohibit[s] recording a communication, in whole or part, without the consent of all parties, no matter the particular role or degree of participation that [] party has in the communication."). In addition, under this (erroneous) reading of the statute, it is unclear why Plaintiff—who clearly subscribes to an Internet service provider to access the Internet—would be any less of a "user" of an "electronic communications service" than Defendant, and why Defendant's consent should matter but not Plaintiff's.

[6] *Sparshott v. Feld Ent., Inc.*, 311 F.3d 425, 432 (D.C. Cir. 2002) is distinguishable because the alleged trap and trace device in that case was a "caller ID system," which the court deemed was not a trap and trace device. The court did not evaluate consent by the user of an "electronic communication service" to the wiretapping.

Thankfully, the Court need not wrestle with Defendant's illogical interpretation of the statute. As noted above, CIPA § 638.51 provides that *only* the "provider" of an "electronic communications service" (again, like a Verizon or Cablevision) can install or use a pen register with a service user's consent. Neither Defendant nor the third parties are electronic communications service providers, meaning the exception does not shield their conduct. The narrow exception was intended to ensure that companies that actually provide access to the Internet do not need warrants to ensure their services are not disrupted, not to shield websites that cause their users data to be intercepted by third parties and to profit off such interception.[7]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendant's Motion in its entirety. If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend to cure any such deficiencies. *See Georgiadis v. First Boston Corp.*, 1992 WL 51500, at *1 (S.D.N.Y. Mar. 9, 1992) (rejecting the defendant's argument that "leave to amend should not have been granted, because plaintiff has amended his complaint once before" and noting "the Court does not believe it proper to dismiss the action with prejudice after the first judicial review of the pleadings").

[7] *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) is inapposite. That case involved the federal Stored Communications Act, which provides an exception for "conduct authorized … by a user of [an electronic communications] service with respect to a communication *of or intended for that user*." 18 U.S.C. § 2701(c)(2) (emphasis added). The communications there were either intended for the websites—who were subscribers to the Internet—or were sent by the websites themselves to the third party. *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d at 502-03. Thus, the conduct at issue was plainly covered by the SCA, which, unlike here, did not limit who could or could not install tracking technology. *In re DoubleClick* also adjudicated affirmative defenses that "hinge on facts not raised on the face of the Complaint" and "are not properly before the Court on this motion to dismiss." *William Gottlieb Management Co. v. Carlin*, 2024 WL 1311854, at *5 (S.D.N.Y. Mar. 26, 2024) (Marrero, J.) (distinguishing *In re DoubleClick*).

Dated: September 6, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*