**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY D'ANTONIO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABLE NEWS NETWORK, INC.,<br><br>Defendant. | Case No. 1:24-cv-03132-VM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**[1]<br><br>**JURY TRIAL DEMANDED** |

[1] The Court has permitted the filing of this Second Amended Complaint via Memo Endorsement dated September 17, 2025. ECF No. 63.

# TABLE OF CONTENTS

**PAGE**


NATURE OF THE ACTION ....... 1

THE PARTIES ....... 3

JURISDICTION AND VENUE ....... 3

FACTUAL ALLEGATIONS ....... 4

I. OVERVIEW OF THE CALIFORNIA INVASION OF PRIVACY ACT ....... 4

II. DEFENDANT VIOLATES THE CIPA § 638.51 ....... 7

A. The Mechanics And Privacy Implications Of IP Addresses ....... 8

1. Differentiating Between Public And Private IP Addresses ....... 8

2. The Privacy Implications Of Public IP Addresses ....... 12

B. The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers ....... 15

1. The PubMatic Tracker And The Data Brokers And Data Sellers It Syncs With ....... 17

(i) Experian/Tapad ....... 20

(ii) Epsilon ....... 23

(iii) TransUnion/Neustar ....... 26

(iv) OpenX ....... 29

2. The ADNXS Tracker And The Data Brokers And Data Sellers It Syncs With ....... 31

(i) Experian/TapAd, OpenX, And PubMatic ....... 34

3. The OpenX Tracker And The Data Broker Partners It Cookie-Syncs With ....... 38

(i) The Trade Desk ....... 41

(ii) TripleLift ....... 45

III. DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ........ 50

A. Data Brokers and Real-Time Bidding: The Information Economy ........ 51

1. Data Brokers ........ 51

2. Real-Time Bidding ........ 57

3. Cookie Syncing ........ 63

B. Defendant Uses The PubMatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........ 68

C. Defendant Uses The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........ 71

D. Defendant Uses The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........ 74

IV. PLAINTIFF'S EXPERIENCE ........ 76

CLASS ALLEGATIONS ........ 79

CAUSES OF ACTION ........ 81

PRAYER FOR RELIEF ........ 84

JURY DEMAND ........ 84

Plaintiff Anthony D'Antonio ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Defendant Cable News Network, Inc. ("Defendant" or "CNN") owns and operates cnn.com (the "Website"). The Website "is the world leader in online news and information and seeks to inform, engage and empower the world."[2]

2. When users visit Defendant's Website, Defendant causes numerous trackers—including but not limited to the PubMatic Tracker, ADNXS Tracker, and OpenX Tracker (collectively, the "Trackers")—to be installed on Website visitors' internet browsers. The Trackers are operated by separate and distinct third parties: PubMatic, Microsoft, and OpenX, respectively (the "Third Parties").

3. Through their respective Trackers, each of the Third Parties record Website users' internet protocol ("IP") addresses and other device identifier information such as device type, and browser type ("Device Metadata"). The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers record on subsequent visits and which is used by the Third Parties to identify and de-anonymize the user.

4. Defendant and these Third Parties then use the data collected by the Trackers to de-anonymize and identify users and hyper-target users with advertising.

---

[2] *About CNN Digital*, CNN, https://www.cnn.com/about

5. Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal Code § 638.50(b).

6. By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

7. The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata. PubMatic and OpenX are registered data brokers in California—and Microsoft syncs with these and other registered data brokers—who focus on identifying and de-anonymizing users through identity resolution services. The purpose of this is to enrich the value of Defendant's Website users by linking those users' IP addresses and Device Metadata to profiles that contain as much personal and demographic information as possible. Users are then offered up for sale with all this collated information to interested advertisers through platforms like PubMatic's and bid on by advertisers using the ADNXS Tracker. Advertisers can then better target Website users based on these attributes and will therefore pay Defendant more to show advertisements to Defendant's users. And the Third Parties share all this data between each other and with various other entities through a process called "cookie syncing," meaning Plaintiff's and Class Member's information winds up in the hands of untold numbers of third parties without consent. All of this enriches Defendant through advertising revenue, makes the Third Parties' services (*i.e.*, their Trackers) more valuable to Defendant and other customers, and strips Plaintiff and Class Members of their anonymity and privacy in the process.

8. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## THE PARTIES

9. Plaintiff Anthony D'Antonio resides in California and has an intent to remain there and is therefore a citizen of California. At all relevant times, Plaintiff D'Antonio was in California when he visited the Website.

10. Defendant CNN is a Delaware corporation with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

12. This Court has specific jurisdiction over Defendant because Defendant maintains an office in New York and therefore availed itself of the privileges of New York law, and Plaintiff's claims arise from or relate to these contacts. Moreover, Defendant consented to suit in New York.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Defendant consented to suit in this District.

## FACTUAL ALLEGATIONS

### I. OVERVIEW OF THE CALIFORNIA INVASION OF PRIVACY ACT

14. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

15. As the California Supreme Court has held in explaining the purpose behind the CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements*.

*Ribas v. Clark* 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

16. As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

17. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

18. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

19. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

20. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices to Internet technologies.

21. For example, if a user *sends* an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user *receives* an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

22. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

23. Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50 specifically to the exact Trackers at issue here. *See*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025)

(finding PubMatic Tracker is a "pen register" within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same as to the PubMatic and ADNXS Trackers); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here are "pen registers" under the CIPA); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

24. This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").

25. Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. DEFENDANT VIOLATES THE CIPA § 638.51

26. To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured in Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**




27. The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

28. In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying ("addressing") information to PubMatic, Microsoft, and OpenX.

29. The Third Parties' Trackers will also send a user ID unique to their Tracker that also allows the user to be tracked across the Internet. And the Third Parties sync their Trackers with those of data brokers to de-anonymize and identify users.

### A. The Mechanics And Privacy Implications Of IP Addresses

30. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses.

31. While IPv6 adoption has been increasing, many networks still rely on IPv4.[3]

32. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

#### *1. Differentiating Between Public And Private IP Addresses*

33. A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally. Public IP addresses are required for devices that need direct internet access.

34. While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible. If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

35. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and

---

[3] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

36. A private IP address is used within an internal network and is not routable on the public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.[4] For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

37. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

38. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). The public IP address determines the phone number who is making the call, which provides the most identifying information. On the other hand, knowing whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household, although less can be gleaned from this fact on its own.

[4] While the Trackers do not collect private IP addresses, as discussed below, the Trackers do collect Device Metadata that distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

39. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the Internet from this location point.[5]

**Figure 2:**




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

40. Thus, the differences between public and private IP addresses are as follows:

//

//

//

[5] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata that distinguishes between devices accessing the same public IP address. So, by installing the Trackers on the browsers of Website users, Defendant allows the Third Parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

**<u>Figure 3:</u>**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br>10.0.0.0 – 10.255.255.255,<br>172.16.0.0 – 172.31.255.255,<br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

41. A public IP address is therefore "routing, addressing, or signaling information."

42. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

43. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[6]

[6] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

### 2. *The Privacy Implications Of Public IP Addresses*

44. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[7]

45. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[8] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[9]

46. Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[10] because "[c]ompanies can use an IP address … to personally identify individuals."[11]

47. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[12] For example, for a job fair in specific city, companies can

---

[7] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[8] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[9] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/4uk2p7k9.

[10] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[11] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[12] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

send advertisements to only those in the general location of the upcoming event.[13]

48. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[14]

49. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[15]

50. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[16] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[17]

51. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[18] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[19]

---

[13] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://tinyurl.com/3vkmjsw2.

[14] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[15] *Id.*

[16] Williams, *supra*.

[17] *Id.*

[18] *Id.*

[19] *Id.*

52. The collection of IP addresses is particularly invasive here given PubMatic, OpenX, and a number of the entities the Third Parties sync with and whose trackers Defendant also installs on Website users' browsers[20] are data brokers. As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[21]

53. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[22]

54. In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, the Third Parties specifically attach IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process. This harm is facilitated and caused by Defendant's installation and use of the Trackers.

---

[20] As detailed herein, those entities include but are not limited to Experian/Tapad, TransUnion/Neustar, and Epsilon (the "Linked Data Brokers").

[21] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[22] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

55. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[23]

56. Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A).[24]

### B. The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers

57. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[25]

58. Often, third-party scripts are installed on websites "for advertising purposes."[26] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[27]

59. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.

---

[23] *Is an IP Address Personal Data?,* CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[24] A "consumer" is defined as "a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).) A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services." Cal. Civ. Code § 1798.140(1).)

[25] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[26] *Id*.

[27] *Id*.

60. Thus, when Plaintiff and Class Members visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's and Class Members' browsers. This allows the Third Parties—through their respective Trackers—to collect Plaintiff's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

61. The Trackers also cause additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

62. Defendant and the Third Parties then use the public IP addresses, Device Metadata, and unique identifiers of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to de-anonymize Plaintiff and Class Members, serve hyper-targeted advertisements on Plaintiff and Class Members, thereby unjustly enriching Defendant and the Third Parties through this improperly-collected information.

63. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

*1. The PubMatic Tracker And The Data Brokers And Data Sellers It Syncs With*

64. PubMatic is a software-as-a-service company that develops the PubMatic Tracker, which it provides to website owners like Defendant for a fee. PubMatic is a registered data broker in California.[28]

65. According to PubMatic, it is "one of the world's leading scaled digital advertising platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[29]

66. As described in more detail below, PubMatic is a "supply side platform" that enables companies like Defendant to sell their user inventory to advertisers, thereby earning revenue and monetizing data. To achieve this, PubMatic uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

67. The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response. This response also includes directions to install the PubMatic Tracker on the user's browser. The PubMatic Tracker, in turn, instructs the user's browser to send PubMatic the user's IP address and Device Metadata—which PubMatic records and decodes—as the below screenshot from Plaintiff's browser traffic on the Website indicates (relevant portions highlighted in red box):[30]

---

[28] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[29] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us

[30] All but the first three digits of Plaintiff's IP address have been redacted throughout this Second Amended Complaint to protect his privacy.

**Figure 4:**


```
  "publisher": {
    "domain": "www.cnn.com",
    "name": "CNN",
    "id": "156512"
  },
  "id": "410931",
  "ext": {
    "key_val": ""
  }
},
"device": {
  "ua": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/134.0.0.0 Safari/537.36",
  "ip": "172.[redacted]
  "js": 1,
  "language": "EN"
},
```


68. Indeed, as PubMatic admits, its Tracker "automatically collects" "Browser and Device Information, such as the IP address you use to connect to an online service; device type and model; manufacturer; operating system type and version (e.g. iOS or Android); web browser type and version (e.g., Chrome or Safari); user-agent; carrier name; time zone; network connection type (e.g., Wi-Fi or cellular); and information about our Publisher's apps and versions currently active on a device."[31]

69. The PubMatic Tracker also stores numerous cookies along with the user's Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Website, the PubMatic Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the PubMatic Tracker causes the browser to send the cookie (the unique identifier "KADUSERCOOKIE" in Figure 5 below) along with the user's Device Metadata to PubMatic, as shown in the below screenshot from Plaintiff's browser. The KADUSERCOOKIE

[31] ADVERTISER PLATFORM PRIVACY POLICY, https://pubmatic.com/legal/privacy-policy/#userinfowecollect

is specifically used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[32]

**Figure 5:**




70. A general diagram of this process is pictured below as Figure 6, which explains how the Website cause the PubMatic Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie:

**Figure 6:**




71. Using the KADUSERCOOKIE, IP address, and Device Metadata, PubMatic can track and identify Website users on the Website and across the Internet.

72. If the user clears his or her cookies, then the user wipes out the PubMatic Tracker from its cache. Accordingly, the next time the user visits Defendant's Website, the process begins

[32] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, https://pubmatic.com/legal/platform-cookie-policy/

over again: (i) Defendant's server installs the PubMatic Tracker on the user's browser, (ii) the PubMatic Tracker instructs the browser to send PubMatic the user's Device Metadata, (iii) the PubMatic Tracker stores a cookie in the browser cache, and (iv) PubMatic will continue to receive the user's Device Metadata on subsequent Website visits with the cookie transmission.

73. In all cases, however, PubMatic receives a user's IP address, Device Metadata, and unique user ID every time its Tracker is loaded by the Website.

74. The PubMatic Tracker shares the user's KADUSERCOOKIE value with other third parties whose trackers Defendant also installs on Website users' browsers. The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles PubMatic and/or these other third parties may have on the user, which are then provided by PubMatic for sale to advertisers.

**(i) Experian/Tapad**

75. The PubMatic Tracker syncs its KADUSERCOOKIE with the Tapad tracker, which Defendant also installs on Website users' browsers. As the below screenshot of traffic from Plaintiff's browser indicates, the value of the "partner_device_id" parameter matches the value of the KADUSERCOOKIE parameter in Figure 5. Indeed, the "idsync" parameter leaves little doubt that PubMatic is matching its cookies with the Tapad tracker to obtain any information Tapad has about the user (and vice versa). Finally, Tapad is installing its own cookies (the unique identifiers, "TapAd_TS" and "TapAd_DID") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

//

//

//

//

**Figure 7:**




76. The Tapad tracker was initially owned and operated by Tapad, a registered data broker in California.[33] Tapad is now owned, and its tracker is therefore now operated, by Experian,[34] another registered data broker.[35] The purpose of the Tapad tracker, especially in conjunction with Experian's services, is to perform identity resolution. As Experian describes it:

> [i]dentity resolution matches fragmented identifiers to a single profile. This creates a unified, cross-channel view of a consumer that helps marketers understand a customer's demographics, lifestyle, interests, and where and how they engage with your

[33] DATA BROKER REGISTRATION FOR TAPAD, INC., https://oag.ca.gov/data-broker/registration/187511.

[34] Allison Schiff, *Telenor Sells Tapad to Experian for $280 Million*, ADEXCHANGER (Nov. 19, 2020), https://www.adexchanger.com/privacy/telenor-sells-Tapad-to-experian-for-280-million/.

[35] DATA BROKER REGISTRATION FOR EXPERIAN INFORMATION SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186691.

> brand. Identity resolution improves campaign targeting and enables marketers to deliver personalized marketing messages.[36]

77. Tapad identifies users by "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi connections, website registrations, browsing history and other inputs."[37] Tapad then aggregated these inputs into what it called a "Device Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[38]

78. Tapad integrates with Experian's "offline consumer data set (purchase behaviors, interests, lifestyle info)."[39] This includes "first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information."[40] And as Experian advertisers, its identity graph is composed of "[o]ver 250M individuals and 126 million households," enabling its partners like PubMatic to "link[] known and anonymous IDs and data back to a single person or household to resolve identity."[41]

//

//

---

[36] https://www.experian.com/marketing/consumer-sync/identity-resolution.

[37] *Id*.

[38] Ingrid Lunden, *Telenor Jumps Into Ad Tech, Acquires Tapad For $360M*, TECHCRUNCH (Feb. 1, 2016), https://tinyurl.com/54wdu4h9.

[39] Anthony Vargas, *How Experian Is Using Tapad To Build New ID Resolution And Analytics Products*, ADEXCHANGER (Feb. 1, 2023), https://www.adexchanger.com/data-exchanges/how-experian-is-using-tapad-to-build-new-id-resolution-and-analytics-products/.

[40] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 6 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs; *see also* EXPERIAN, OMNIIMPACT, https://tinyurl.com/mve5jb65.

[41] GRAPH | EXPERIAN'S IDENTITY GRAPH, https://www.experian.com/marketing/consumer-sync/identity-resolution/identity-graph.

**<u>Figure 8:</u>**




79. Thus, when PubMatic sells user data to advertisers on the Website—as is the PubMatic Tracker's function as a demand-side platform—advertisers can better identify and target their bids as a result of the PubMatic Tracker syncing with Experian/Tapad's tracker, which de-anonymizes and identifies users. Experian and Tapad, in turn, build on their already expansive database through this transaction. And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

**(ii) <u>Epsilon</u>**

80. As another example, the PubMatic Tracker syncs its KADUSERCOOKIE with the Dotomi tracker, which Defendant also installs on Website users' browsers. The Dotomi tracker is owned and operated by Epsilon, another registered data broker in California.[42]

81. As the below screenshot from Plaintiff's browser indicates, the value of the "nuid" parameter matches the value of the KADUSERCOOKIE parameter in Figure 5. Here too, the "pubmatic-match.dotomi.com" value leaves little doubt that PubMatic is matching its cookies with the Dotomi tracker to obtain any information Epsilon has about the user (and vice versa). Finally, Tapad is installing its own cookies (the unique identifier, "DotomiTest") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

[42] DATA BROKER REGISTRATION FOR EPSILON DATA MANAGEMENT, LLC, https://oag.ca.gov/data-broker/registration/186453.

**Figure 9:**

```
       :authority pubmatic-match.dotomi.com
          :method GET
            :path /match/bounce/current?networkId=17100&version=1&nuid=10EEF193-2D71-46BC-9882-37C5F6692CAA&gdpr=0&gdpr_consent=
          :scheme https
           accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding gzip, deflate, br, zstd
  accept-language en-US,en;q=0.9
           cookie DotomiTest=243410c08ee11e97
         priority i
          referer https://ads.pubmatic.com/
        sec-ch-ua "Chromium";v="134", "Not:A-Brand";v="24", "Google Chrome";v="134"
```

82. Epsilon is a global advertising and marketing technology company and "is the only digital advertising services partner that connects every display, online video, connected TV and audio impression to a real person."[43]

83. Epsilon recognizes that its clients want "[t]o move potential customers from awareness to action" and thus "need to know who [the clients are] reaching."[44] Thus, with Epsilon's "CORE ID, the industry's only identity solution using all available online and offline identifiers, brands can reach the right person across their favorite content on any device."[45]

84. Epsilon boasts that it has "[u]nrivaled accuracy at an individual level" because its technology requires a "complete name and address validated by transactions" to "ensure marketers reach the right person with maximum precision and efficiency."[46] "The CORE ID graph of 200M+ U.S. consumers is the only solution grounded in offline names and address. This allows us to enable omnichannel people-based activation, measurement and waste reduction."[47]

---

[43] *Epsilon Digital*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital.

[44] *Epsilon Digital | Online Video*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital/online-video.

[45] *Id.*

[46] *Identity: CORE ID*, EPSILON, https://www.epsilon.com/us/products-and-services/identity-core-id.

[47] *Id.*; *see also* COREID, https://youtu.be/PxkKNG7r1gc?si=TBoLlCm6XalzZTX3&t=30.

85. In fact, Epsilon has bragged about how much information it possesses about consumers, claiming their identity graph "is the most accurate" and addresses "real people, not devices or cookies"[48]:

**Figure 10:**




86. Epsilon advertises it procures consumers' identities from "public records (including voter registration files, phone books, deeds, and permits), surveys ('self-reported data from 20 million households'), partners (data from corporate sources), and 'multi-sourced' information, which it describes as 'real transactional data' on categories of purchases."[49]

87. Epsilon then "combines all your different data piles into one. Demographic info, offline purchases, website visits, email opens—whatever you have—they'll all connect to a representation of that person."[50]

---

[48] https://youtu.be/YCsE0VbH3vI?si=SavCeoDK5zdRbfQL&t=155.

[49] SHERMAN, *supra*, at 7.

[50] EPSILON PEOPLECLOUD, https://tinyurl.com/ykuvd3xz.

**Figure 11:**




88. Epsilon notes that by installing its tracker, companies like Defendant can "stay connected" with their users "even when their cookies fad away, they get a new phone, a new job, move across the country, and start going by a cool nickname. Their profile keeps up with all those changes."[51]

89. Thus, when PubMatic sells user data to advertisers on the Website—as is the PubMatic Tracker's function as a demand-side platform—advertisers can better identify and target their bids as a result of the PubMatic Tracker syncing with Epsilon's tracker, which de-anonymizes and identifies users. Epsilon, in turn, builds on its already expansive database through this transaction. And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

**(iii) <u>TransUnion/Neustar</u>**

90. As another example, PubMatic syncs its KADUSERCOOKIE with the AGKN tracker, which Defendant also installs on Website users' browsers. As the below screenshot from Plaintiff's browser indicates, the value of the "puid" parameter matches the value of the

[51] EPSILON PEOPLECLOUD, https://youtu.be/1hGBlQYTnvE?si=Hm4tFaAqCYMf_rPB&t=52.

KADUSERCOOKIE parameter in Figure 5, meaning PubMatic is syncing its cookies with the AGKN tracker to obtain any information the AGKN tracker has about the user (and vice versa). Finally, the AGKN tracker is installing its own cookies (the unique identifier, "ab") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 12:**

```
       :authority aa.agkn.com
          :method GET
            :path /adscores/g.pixel?sid=9212308278&puid=10EEF193-2D71-46BC-9882-37C5F6692CAA
          :scheme https
           accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding gzip, deflate, br, zstd
  accept-language en-US,en;q=0.9
           cookie ab=0001%3AzmOt6SiLw%2BTf8e0ISHBDz2HMKeP092dV
         priority i
          referer https://ads.pubmatic.com/
        sec-ch-ua "Chromium";v="134", "Not:A-Brand";v="24", "Google Chrome";v="134"
```

91. AGKN is short for Aggregate Knowledge. In October 2013, Neustar, a registered data broker in California,[52] purchased Aggregate Knowledge (AGKN) for $119 million. This combined Neustar's "access to a large dataset of telephone numbers and location data through relationships with major ISPs and wireless carriers" and "geo-targeted online advertising" with AGKN's "ability to help clients allocate media dollars, and expand cross-sell opportunities with marketers and agencies."[53]

92. In or about December 2021, TransUnion, who is also a registered data broker in California,[54] acquired Neustar for $3.1 billion. The press release stated Neustar was "a premier

---

[52] DATA BROKER REGISTRATION FOR NEUSTAR, INC., https://oag.ca.gov/data-broker/registration/562353.

[53] Zach Rodgers, *Neustar Acquires DMP Aggregate Knowledge For $119M*, ADEXCHANGER (Oct. 30, 2013), https://www.adexchanger.com/data-exchanges/neustar-acquires-aggregate-knowledge-for-119m/.

[54] DATA BROKER REGISTRATION FOR TRANSUNION DIGITAL LLC, https://oag.ca.gov/data-broker/registration/562235.

identity resolution company … [that] enables customers to build connected consumer experiences by combining decision analytics with real-time identity resolution services driven by its OneID™ platform."[55] Thus, "Neustar Marketing Solutions is now part of TransUnion TruAudience," "Neustar Fraud Solutions is now part of TransUnion TruValidate," and "Neustar Communications Solutions is now part of TransUnion TruContact."[56]

93. Neustar's services, as integrated with TransUnion's, enable advertisers to target specific people. This is done through TruAudience Identity Solutions, which "[e]stablish[es] a single view of each customer across offline and online touchpoints with advanced identity resolution and data enrichment capabilities."[57]

94. Indeed, TruAudience "[e]nhance[s] your view of the customer with fresh contact information and predictive demographic data for insights, audience building, and engagement," which can be compiled into a "first-party identity graph to power prospecting, media monetization, or agency operations."[58]

**<u>Figure 13:</u>**




[55] TRANSUNION AND NEUSTAR ANNOUNCE TRANSACTION CLOSE, https://newsroom.transunion.com/transunion-and-neustar-announce-transaction-close/.

[56] Neustar, https://home.neustar/.

[57] TRUAUDIENCE IDENTITY SOLUTIONS, https://www.transunion.com/solution/truaudience/identity.

[58] *Id.*

95. TruAudience also allows website operators like Defendant to "[c]reate audiences using your first-party data, third-party audiences, and/or TransUnion's marketing attributes." Defendant can then "[m]ake the most of [its] first party data assets with advanced identity resolution and audience building capabilities, alongside a broad distribution network," and "[a]ccess audiences from trusted third-party data providers to reach your ideal customers across all verticals."[59] This includes "[u]sing TransUnion data,"[60] which is obviously extensive given TransUnion's size and credit reporting services.

96. In other words, the purpose of TransUnion's services is to provide as much information about a user from as many sources as possible to advertisers, such that the user is de-anonymized and has a plethora of personal and demographic information attached to them when offered up for sale. TransUnion does this through the AGKN tracker, which links the information the tracker collects about the user from the Website with TransUnion's vast repository of data. That information is then shared with PubMatic's Tracker to enable better targeting by advertisers. And better targeting means advertisers will pay more money to show advertisements to Defendant's users, which enriches Defendant at the cost of its users' privacy.

**(iv) <u>OpenX</u>**

97. As a final example, PubMatic also syncs KADUSERCOOKIE with the OpenX Tracker. As pictured in the below screenshot from Plaintiff's browser, the value of the "uid-bp-

---

[59] AUDIENCE SOLUTIONS, https://www.transunion.com/solution/truaudience/audiences. "First-party data is collected directly from a company's own customers through platforms like websites, mobile apps, or physical stores … Third-party data is procured from external data brokers and aggregators, providing information about consumers but without a direct relationship between the data collector and the consumer." Derek Andersen, *What Marketers Need to Know About 1st, 2nd, and 3rd-Party Data*, INVOCA BLOG (Mar. 3, 2025), https://www.invoca.com/blog/marketers-need-to-know-first-second-third-party-data.

[60] *Id.*

41414" parameter matches the value of the KADUSERCOOKIE parameter in Figure 5. This allows PubMatic to obtain whatever information OpenX has on the user (and vice versa). Finally, OpenX is installing its own cookies (the unique identifiers, "uid-bp") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 14:**




98. As OpenX is another one of the Third Parties, OpenX and the capabilities of its Tracker are alleged in greater detail below. Nonetheless, the purpose of OpenX's service is to provide as much information about a user from as many sources as possible to advertisers, such that the user is de-anonymized and has a plethora of personal and demographic information attached to them when offered up for sale. OpenX does this through its Tracker, which links the information its Tracker collects about the user from the Website with OpenX's vast repository of data. That information is then shared with PubMatic's Tracker to enable better targeting by

advertisers. And better targeting means advertisers will pay more money to show advertisements to Defendant's users, which enriches Defendant at the cost of its users' privacy.

* * *

99. This is a non-exhaustive list of the Linked Data Brokers with whom PubMatic syncs its Tracker. Suffice it to say, PubMatic is syncing its Tracker with registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes and to enrich Defendant without users' consent.

100. The PubMatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

101. Further, the PubMatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See*, *e.g.*, *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023); *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

102. Because the PubMatic Tracker captures outgoing "routing, addressing, and signaling" information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

103. The PubMatic Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

*2. The ADNXS Tracker And The Data Brokers And Data Sellers It Syncs With*

104. Microsoft is a technology company with software-as-a-service products, such as Microsoft Advertising. Microsoft owns and operates the ADNXS Tracker, which it provides to

website owners like Defendant for a fee. Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service.

105. According to Microsoft, the ADNXS Tracker is "a strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business results."[61]

106. The ADNXS Tracker is a "demand-side platform," which is explained in more detail below. In short though, Microsoft facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity through this Tracker. This process enables Defendant to monetize its Website. To achieve this, Microsoft uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

107. The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser. The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records and decodes—as the below screenshot from Plaintiff's browser indicates (relevant portions highlighted in red boxes):

//

//

//

//

[61] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

**Figure 15:**




108. Moreover, Microsoft stores a cookie (the unique identifier, "uuid2" in the screenshot above) with the user's IP address and Device Metadata in the user's browser cache. The UUID2 records information that helps differentiate between devices and browsers. This information is used to pick out ads delivered by the platform and assess the ad performance and its attribute payment."[62]

109. When the user subsequently visits Defendant's Website, the ADNXS Tracker locates the UUID2 stored on the user's browser. If the UUID2 is stored on the browser, the ADNXS Tracker causes the browser to send the UUID2 along with the user's IP address and Device Metadata to Microsoft. A general diagram of this process is pictured in Figure 6 above, which explains how the Website causes the ADNXS Tracker to install a cookie on the user's

[62] ATFX, COOKIE POLICY, https://www.atfxconnect.com/en/cookies-policy/.

browser and instructs the user's browser to send the user's IP address and Device Metadata along with the unique UUID2 identifier.

110. Using the IP addresses, Device Metadata, and UUID2 identifier, Microsoft can track and identify Website users on the Website and across the Internet.

111. If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache. Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a UUID2 cookie in the browser cache, and (iv) Microsoft will continue to receive the user's IP address and Device Metadata on subsequent Website visits along with the UUID2.

112. In all cases, however, Microsoft receives a user's IP address, Device Metadata, and unique UUID2 identifier every time its Tracker is loaded by the Website.

113. Like PubMatic, Microsoft is also syncing its unique user identifier with the Linked Data Brokers to obtain whatever information that third party knows about the user (and vice versa) for use in real-time bidding.

**(i) <u>Experian/TapAd, OpenX, And PubMatic</u>**

114. The ADNXS Tracker syncs with the TapAd tracker in the same manner as the PubMatic Tracker does. As pictured in the below screenshot from Plaintiff's browser, the value of the "partner_id" parameter is "APPNEXUS," and the value of the "partner_device_id" parameter matches the value of the "uuid2" parameter in Figure 15. This allows Microsoft to obtain the information Tapad/Experian has on the user (and vice versa). And, as with PubMatic, Tapad sets its own cookies on the user's browser:

**Figure 16:**

```
                       GET /idsync/ex/receive?partner_id=APPNEXUS&partner_device_id=6058205319750140356&pt=ab4457f8-41fa-4b5d-9e87-bac4bf097a94%252C%252C h3
             :authority pixel.tapad.com
                :method GET
                  :path /idsync/ex/receive?partner_id=APPNEXUS&partner_device_id=6058205319750140356&pt=ab4457f8-41fa-4b5d-9e87-bac4bf097a94%2C%2C
                :scheme https
                 accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
        accept-encoding gzip, deflate, br, zstd
        accept-language en-US,en;q=0.9
                 cookie TapAd_TS=1743285638140; TapAd_DID=ab4457f8-41fa-4b5d-9e87-bac4bf097a94; TapAd_3WAY_SYNCS=1!2134
               priority i
                referer https://ads.yieldmo.com/
              sec-ch-ua "Chromium";v="134", "Not:A-Brand";v="24", "Google Chrome";v="134"
       sec-ch-ua-mobile ?0
     sec-ch-ua-platform "macOS"
         sec-fetch-dest image
         sec-fetch-mode no-cors
         sec-fetch-site cross-site
sec-fetch-storage-access active
             user-agent Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/134.0.0.0 Safari/537.36
```

115. As another example, the ADNXS Tracker syncs with the OpenX Tracker, whose functionalities are alleged below. As pictured in the below screenshot from Plaintiff's browser, the value of the "uid-bp-951" parameter matches the value of the "uuid2" parameter in Figure 15. This allows Microsoft to obtain the information OpenX has on the user (and vice versa):

**Figure 17:**

```
302  GET  rtb.openx.net  /sync/prebid?gdpr=&gdpr_consent=&r=https%253A%252F%2...  15:00:45
Filter:
Overview  Contents  Summary  Chart  Notes
                 GET /sync/prebid?gdpr=&gdpr_consent=&r=https%253A%252F%252Fads.stickyadstv.com%252Fuser
          Accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
 Accept-Encoding gzip, deflate, br, zstd
 Accept-Language en-US,en;q=0.9
      Connection keep-alive
          Cookie uid-bp-2009=1; UID=542289b522ab2a8cb9617576968c6; uid-bp-11554=k-iRjleBp2SI0NI8Rao4Tb9iF
Cookie
uid-bp-2009=1; UID=542289b522ab2a8cb9617576968c6; uid-bp-11554=k-iRjleBp2SI0NI8Rao4Tb9iFLX7ihJ3urWHwMmw; uid-bp
mwbcdc_7489061761592098439; uid-bp-26913=AAKyuU7P0NsAAByQtX-UeQ; uid-bp-892=199a7456-899f-408f-a161-5ab9c317
5w6FUpXwFj_~A uid-bp-951=6058205319750140356 uid-bp-41408=8a7df3b6-c77c-448e-8900-24dc076c28ee; uid-bp-41396=1
46BC-9882-37C5F6692CAA; uid-bp-23329=zEhelQVX1TYEec5; uid-bp-25746=b8795879-b95b-4f64-afd4-9aecdf42f157; uid-bp-2
25522=c9d19276-0dd6-4184-8dae-8c4308205d76-67e86d80-5553; uid-bp-22945=40414537-0ce9-11f0-985e-04d1628f59db; uic
```

116. As a last example, the ADNXS Tracker syncs with the PubMatic Tracker, whose functionalities are alleged below as one of The Third Parties. As pictured in the below screenshot from Plaintiff's browser, PubMatic also sets numerous "KRTBCOOKIES" on users' browsers. The KRTBCOOKIE identifiers are used "to correlate our user IDs with those of our partners (such

as demand side platform clients [*i.e.*, Microsoft] or other advertising technology companies). We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements. This enables the partner to make better decisions about whether to display an advertisement to you."[63]

**Figure 18:**

| Name | Value |
|---|---|
| KADUSERCOOKIE | 10EEF193-2D71-46BC-9882-37C5F6692CAA |
| KRTBCOOKIE_148 | 19421-uid:026D9463F063428B85A8364045E0E32C&KRTB&23486-uid:02 |
| KRTBCOOKIE_377 | 6810-199a7456-899f-408f-a161-5ab9c317c90b&KRTB&22918-199a7456 |
| DPSync4 | 1743292800%3A248%7C1743811200%3A252_164_265%7C1744416000% |
| KRTBCOOKIE_27 | 16735-uid:422967e8-6d85-4700-bde9-606c0321b17e |
| KRTBCOOKIE_860 | 16335--HRB6kqlVu9QbFQLppsof6wK6Ew&KRTB&23334--HRB6kqlVu9Q |
| KRTBCOOKIE_632 | 23041-qaZyhlwidKWzoGNLuPu57RLWI-ex45rfOPdINnWWgcw&KRTB&2 |
| KRTBCOOKIE_97 | 3385-uid:k-VEv35Rp2SI0NI8Rao4Tb9iFLX7jaF_Wjz-k4zw&KRTB&23037-u |
| KRTBCOOKIE_1097 | 23028-41701bba-db9f-4008-beb3-0ba2a924406a |
| KRTBCOOKIE_57 | 23339-6058205319750140356&KRTB&22776-6058205319750140356 |
| KRTBCOOKIE_594 | 17105-RX-b7ae2661-4595-4a3b-8501-9491c6fcef06-005&KRTB&17107- |
| KRTBCOOKIE_52 | 22772-R4E32F_125F48C97_1E8FEFF9&KRTB&23092-R4E32F_125F48C97_ |
| KRTBCOOKIE_32 | 11175-AQAIDvJZGdVblwIfl6EzAQEBAQEBAQCU4urV6QEBAJTi6tXp&KRT |
| KRTBCOOKIE_153 | 19420-EC8yShB8b0ILLjVCRX16QkJ-MkMLL2RKRCy67uk6&KRTB&22979-E |
| KRTBCOOKIE_18 | 22947-1978557998369144669 |
| KRTBCOOKIE_1323 | 23480-OPUd6a77bf1d9c5429c80bba58b78b79c36&KRTB&23485-OPUd |
| KRTBCOOKIE_188 | 3189-c9d19276-0dd6-4184-8dae-8c4308205d76-67e86d80-5553&KRTB |
| pubsyncexp | 1743307238833 |
| KRTBCOOKIE_964 | 20918-cuid_3cc7dd92-0ce9-11f0-b27b-12328e819285&KRTB&23354-cu |

117. In other words, the KRTBCOOKIE is used by PubMatic—a supply-side platform—to sync the information it knows about the users it is selling to advertisers, with demand-side platforms like the ADNXS Tracker who are providing bids from advertisers on users (and vice versa). And here, as is visible in the above screenshot, the "6058205319750140356" value in the "KRTBCOOKIE_57" matches the "uuid2" value the ADNXS Tracker set for Plaintiff.

118. Thus, Microsoft syncs its ADNXS Tracker with the other Third Parties alleged herein (PubMatic and OpenX), as well as Experian/Tapad in the same manner PubMatic does. The purpose of these various data brokers' services is to provide as much information about a user from as many sources as possible to advertisers, such that the user is de-anonymized and has a

---

[63] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/.

plethora of personal and demographic information attached to them when offered up for sale. Each Third Party or Linked Data Broker does this through its respective tracker, which links the information its tracker collects about the user from the Website with each data broker's vast repository of data (or is shared amongst one another through cookie syncing). That information is then shared with the ADNXS Tracker to enable better targeting by advertisers. And better targeting means advertisers will pay more money to show advertisements to Defendant's users, which enriches Defendant at the cost of its users' privacy.

119. Moreover, even if Microsoft does not directly sync with a specific Linked Data Broker (*e.g.*, Epsilon), by syncing with another entity who does (*e.g.*, PubMatic), Microsoft still learns all the information about that user that the Linked Data Broker knows.

* * *

120. This is a non-exhaustive list of the Linked Data Brokers with whom Microsoft syncs its ADNXS Tracker. Microsoft is syncing its ADNXS Tracker with registered data brokers and data sellers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes and to enrich Defendant without users' consent.

121. The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

122. Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See*, *e.g.*, *James*, 701 F. Supp. 3d at 958; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

123. Because the ADNXS Tracker captures outgoing "routing, addressing, and signaling" information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

124. The ADNXS Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

*3. The OpenX Tracker And The Data Broker Partners It Cookie-Syncs With*

125. OpenX is a registered data broker in California[64] that helps companies, like Defendant "utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[65]

126. OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[66]

127. In other words, OpenX compiles comprehensive user profiles by tracking users across the Internet. OpenX then enriches the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving Defendant's revenue. To achieve this,

[64] *Data Broker Registration for OpenX Technologies, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/193614.

[65] *OpenAudience*, OpenX, https://www.openx.com/why-openx/openaudience/.

[66] *Data Activation*, OpenX, https://www.openx.com/why-openx/openaudience/.

OpenX uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

128. The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the OpenX Tracker on the user's browser. The OpenX Tracker, in turn, instructs the user's browser to send OpenX the user's IP address and Device Metadata—which OpenX records and decodes—as the below screenshot from Plaintiff's browser indicates (relevant portions highlighted in red boxes).

**<u>Figure 19:</u>**




129. Moreover, OpenX stores cookies (including but not limited to the unique identifiers, "i" and "univ_id," in the screenshot above) along with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Website, the

OpenX Tracker locates the identifiers stored on the user's browser. If the identifiers are stored on the browser, the OpenX Tracker causes the browser to send the identifiers along with the user's IP address and Device Metadata to OpenX. A general diagram of this process is pictured as Figure 6, which explains how the Website causes the OpenX Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the identifiers.

130. If the user clears his or her cookies, then the user wipes out the OpenX Tracker from its cache. Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the OpenX Tracker on the user's browser, (ii) the OpenX Tracker instructs the browser to send OpenX the user's IP address and Device Metadata, (iii) the OpenX Tracker stores a cookie in the browser cache, and (iv) OpenX will continue to receive the user's IP address and Device Metadata on subsequent Website along with the unique identifiers.

131. In all cases, however, OpenX receives a user's IP address, Device Metadata, and unique user identifiers every time its Tracker is loaded by the Website.

132. Like the other Third Parties, OpenX is also cookie-syncing with other third parties to obtain whatever information that third party knows about the user (and vice versa) for use in real-time bidding. Indeed, as alleged above, OpenX syncs its Tracker with both PubMatic's and Microsoft's.

133. However, as a data broker, OpenX is also syncing with data sellers whose trackers Defendant also installs on Website users' browsers. The purpose of this syncing is to enable the data sellers to de-anonymize and identify Website users by syncing with OpenX's Tracker (and therefore, OpenX's vast repository of user profiles), thus enabling Website users to be sold for more money.

### (i) The Trade Desk

134. OpenX syncs its Tracker with the Adsrvr tracker, which Defendant also installs on Website users' browsers. The Adsrvr tracker is owned and operated by The Trade Desk. OpenX has openly touted its synchronization with The Trade Desk's identifiers.[67]

135. As the below screenshot from Plaintiff's browser indicates, the value of the "TDID" parameter matches the value of the "univ_id" parameter in Figure 19, meaning OpenX is syncing its cookies with The Trade Desk to obtain any information The Trade Desk has about the user (and vice versa). Finally, The Trade Desk is installing its own cookies (the unique identifiers, "TDID" and "TDCPM") on Plaintiff's browser for further tracking, syncing, and de-anonymization. Indeed, The Trade Desk notes the TDID is used to "establish[] the correlation between unique identifiers (IDs) for the same user in The Trade Desk platform and your platform,"[68] while the TDCPM identifier "is used to register a unique ID that identifies a returning user's device. The ID is used for targeted ads."[69]

**Figure 20:**




[67] Allison Schiff, *OpenX Is Latest SSP To Join Unified ID 2.0*, ADEXCHANGER (Dec. 16, 2020), https://www.adexchanger.com/online-advertising/openx-is-latest-ssp-to-join-unified-id-2-0/

[68] COOKIE MAPPING, THE TRADE DESK, https://partner.thetradedesk.com/v3/portal/data/doc/CookieSyncing.

[69] COOKIE LIST, NOKIA, https://www.nokia.com/cookies/cookie-list/.

136. The Trade Desk is a demand-side platform (explained below) that companies use to "analyze[] up to 15 million ad opportunities each second to help [advertisers] optimize campaigns in real time with more flexibility and control."[70] According to The Trade Desk, "[t]hrough its self-service, cloud-based platform, ad buyers can create, manage, and optimize digital advertising campaigns across ad formats and devices."[71] For website owners like Defendant this means they can potentially benefit from increased demand for their ad inventory.

137. Like Microsoft's ADNXS Tracker, The Trade Desk facilitates the selling of Defendant's Website users to interested advertisers. "Advertisers can use the platform to target specific audiences based on various parameters such as demographics, interests, browsing behavior, and location. The platform also offers real-time bidding capabilities, allowing advertisers to bid on ad placements in real-time auctions."[72]

138. Besides its real-time bidding capabilities, The Trade Desk's "Unified ID 2.0 Initiative" facilitates identifying consumers "across the open internet" and helps "create more durable audience segments for targeting and measurement."[73] "Unified ID 2.0 leverages encrypted email and phone number data to provide a[n allegedly] privacy-conscious, secure, and accurate identity standard for the entire digital advertising ecosystem."[74]

139. However, the FTC has long warned that "hashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data

---

[70] THETRADEDESK, https://www.thetradedesk.com/our-demand-side-platform.

[71] *The Trade Desk Launches New Media Trading Platform for the Modern Marketer*, THETRADEDESK (July 7, 2021), https://tinyurl.com/mrej3ch7.

[72] THETRADEDESK, AMPLITUDE, https://tinyurl.com/mu8zebpd.

[73] THETRADEDESK, https://www.thetradedesk.com/unified-id-solution-2-0.

[74] THETRADEDESK, https://unifiedid.com/.

*is risky at best, and usually wrong.*"[75] Indeed, as recently as July of 2024, the FTC stated again that "hashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."[76]

140. Furter undermining any anonymity, The Trade Desk maintains all user data in an Identity Alliance, which "is a coalition of the industry's leading identity graph solutions that seamlessly combines all people, households, and devices into a single, unified graph."[77] This graph is built on the "ingest[ion] of billions of events" and "deterministic identifiers" capitalizing on its "sophisticated machine-learning model that can use the best data available to deliver scale and precision for targeting audiences across devices and channels."[78]

---

[75] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://tinyurl.com/ykttwvjn (emphasis added).

[76] *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024), https://tinyurl.com/y5b7nayk.

[77] HOW IDENTITY GRAPHS ARE BUILT — THE PRESENT AND THE FUTURE, https://tinyurl.com/3d7xzyfc.

[78] *Id.*

**Figure 21:**




141. In addition, The Trade Desk's "Koa AI" continually analyzes ad performance data to enhance advertising campaigns by identifying and prioritizing the most valuable ad impressions in real-time.[79] The Trade Desk boasts that "[its] AI prioritizes and selects the best-performing and most relevant inventory based on a campaign's goals, helping [advertisers] achieve the best price per impression."[80]

142. The Trade Desk's AI capabilities also "analyze existing customer data and build lookalike audiences. This helps brands expand reach by targeting users who share similar behaviors and characteristics with their best-performing customers."[81]

143. The Trade Desk not only has geotargeting capabilities but the platform also "allows radius targeting around specific coordinates and even combines demographic data with

---

[79] THETRADEDESK, https://www.thetradedesk.com/our-demand-side-platform/ai-artificial-intelligence.

[80] *Id.*

[81] IMPROVADO, https://improvado.io/blog/the-trade-desk-guide.

geolocation for precision advertising."[82] Moreover, "[t]hrough [its] partnerships with retail media networks, The Trade Desk provides access to transaction-based targeting, allowing brands to reach shoppers based on real purchase data from major retailers."[83]

144. The upshot of all this is that The Trade Desk enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format. And by syncing with the OpenX Tracker, The Trade Desk enhances the already massive amount of information it knows about users with OpenX's equally massive repository, thus thoroughly de-anonymizing and identifying Website users and enriching Defendant in the process.

145. In fact, Defendant's parent company, Warner Bros. Discovery, has publicly touted its use of Trade Desk's tracker.[84]

**(ii) <u>TripleLift</u>**

146. OpenX also syncs its Tracker with the TripleLift tracker, which Defendant also installs on Website users' browsers. As the below screenshot from Plaintiff's browser indicates, the value of the "xuid" parameter matches the value of the "univ_id" parameter in Figure 19, meaning OpenX is syncing its cookies with TripleLift to obtain any information TripleLift has about the user (and vice versa). And TripleLift is installing its own cookies (the unique identifiers, "tluid" and "tluidp") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

---

[82] *Id.*

[83] *Id.*

[84] WARNER BROS. DISCOVERY ADOPTS UNIFIED ID 2.0 SOLUTION ACROSS MAX AND DISCOVERY+, https://tinyurl.com/4vpbcv7p.

**<u>Figure 22:</u>**

| | |
|---|---|
| :authority | eb2.3lift.com |
| :method | GET |
| :path | /xuid?mid=3658&xuid=199a7456-899f-408f-a161-5ab9c317c90b&dongle=0cfd&gdpr=0&gdpr_consent= |
| :scheme | https |
| accept | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| cookie | receive-cookie-deprecation=1; tluid=151811974098458808669; tluidp=151811974098458808669 |
| priority | u=2, i |
| referer | https://eb2.3lift.com/ |
| sec-ch-ua | "Chromium";v="134", "Not:A-Brand";v="24", "Google Chrome";v="134" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | image |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/134.0.0.0 Safari/537.36 |

147. Of note, the TLUID "is used to identify web browsers across sites and over time for ad serving purposes."[85] The TLUIDP "is used to identify web browsers on a top-level domain over time for ad serving purposes *in situations where third party cookies are disabled*."[86] That is, when Defendant installs TripleLift's Tracker, TripleLift can still track and identify users to sell their information, even if users have purportedly blocked cookies.

148. TripleLift is a "supply-side platform" whose "technology powers ads that make advertising better for everyone—higher performing for brands, more lucrative for publishers and more respectful of the consumer's experience."[87]

149. In marketing speak, TripleLift claims to combine "actionable data, advanced targeting, and premium inventory, we empower publishers and brands to discover new opportunities, achieve measurable outcomes, and engage audiences seamlessly across every

---

[85] EY, COOKIE POLICY, https://www.ey.com/en_ce/legal-and-privacy/cookie-policy.

[86] *Id.*

[87] *Technology*, TRIPLELIFT, https://triplelift.com/technology.

platform."[88] In actuality, TripleLift is an SSP that enables website operators like Defendant to sell their user inventory to interested advertisers.

150. On the advertiser side, TripleLift's "data & targeting technology, TripleLift Audiences, ensures [advertisers] reach the right audience with a robust library of audience segments, optimizing toward your desired KPIs."[89] On the publisher side (*i.e.*, Defendant and other website operators), TripleLift promisers to "[u]nlock new revenue opportunities and drive incremental dollars effortlessly."[90]

151. TripleLift specifically discusses its real-time bidding capabilities, noting it can provide "the most competitive price" for user inventory and "[d]ynamically adjust bids to reach the most relevant audiences"[91]:

**<u>Figure 23:</u>**




152. TripleLift also touts its integration with data brokers like OpenX and other "data partners," which it claims enables "advertisers to reach the right audience with precision. By

[88] CREATIVE THAT PERFORMS, TRIPLELIFT, https://triplelift.com/about/.

[89] ADVERTISERS, TRIPLELIFT, https://triplelift.com/advertiser-solutions/.

[90] PUBLISHERS, TRIPLELIFT, https://triplelift.com/publisher-solutions/.

[91] TRIPLELIFT SSP, https://triplelift.com/triplelift-ssp/.

leveraging first-party and contextual data, we deliver personalized and impactful ad experiences. Our data-driven targeting solutions ensure that your ads reach relevant users, boosting engagement and ROI"[92]:

**Figure 24:**




153. "TripleLift Audiences packages audience segments spanning third-party and first-party data to deliver outcomes for advertisers today and in a cookieless future."[93] Its use cases include "[a]dvertiser first-party data retargeting based on a known list of consumers."[94]

154. By way of example, if a home-goods brand wants to use TripleLift to serve its ads, it can purchase TripleLift's "Home Curated Deal" to reach "people who are investing their time and money close to home."[95] By choosing this set of data, the home-goods brand will be able to target "audiences spending time on home improvement, home entertaining, outfitting their setups, browsing real estate, raising kids and adopting pets."[96] This data set can be used for ads in the "Native, Display and Video" formats, "in placements known to deliver high viewability and high

---

[92] PARTNERS, TRIPLELIFT, https://triplelift.com/partners/.

[93] SMART DATA & TARGERTING FOR ADVERTISERS, TRIPLELIFT, https://web.archive.org/web/20240325054603/https://triplelift.com/products/audiences-advertisers/.

[94] *Id.*

[95] HOME, TRIPLELIFT, https://web.archive.org/web/20240405090112/https://triplelift.com/exchange-traded-deals/home/.

[96] *Id.*

video completion rates."[97] TripleLift ensures that these data sets "are refreshed on an on-going basis so that only the highest performing placements are included."[98]

155. In short, by installing TripleLift's tracker on Website users' browsers, Defendant and TripleLift can de-anonymize users by correlating their IP addresses, Device Metadata, and unique identifiers to profiles maintained data brokers like OpenX, and sell those profiles to advertisers to enrich Defendant. TripleLift also benefits from this arrangement, as it collects additional information about users it can use in the future on behalf of other clients, and can continue to track now de-anonymized users across the Internet.

* * *

156. This is a non-exhaustive list of the entities with whom OpenX syncs its Tracker. OpenX is syncing its Tracker with registered data brokers and data sellers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes and to enrich Defendant without users' consent.

157. The OpenX Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

158. Further, the OpenX Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See, e.g.*, *James*, 701 F. Supp. 3d at 958; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

[97] *Id.*

[98] *Id.*

159. Because the OpenX Tracker captures outgoing "routing, addressing, and signaling" information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

160. The OpenX Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

## III. DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

161. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy. *See*, *e.g.*, *Deivaprakash*, 2025 WL 2541952, at *4, *4 n.4.

162. As alleged herein, the Trackers are designed to de-anonymize and identify Website users by linking various identifiers to comprehensive profiles, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

163. To put the invasiveness of Defendant's violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

164. The import of these concepts is that: (i) the Third Parties are data brokers or sync with the Linked Data Brokers to uniquely identify and de-anonymize Website users by matching users' their IP addresses, Device Metadata, and unique ID values with comprehensive profiles held by the Linked Data Brokers (or the Third Parties themselves); (ii) the Third Parties share that information amongst one another and with other entities like the Linked Data Brokers to create the

most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant, the Third Parties, and the Linked Data Brokers and to the detriment of users' privacy interests.

### A. Data Brokers and Real-Time Bidding: The Information Economy

#### *1. Data Brokers*

165. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[99] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

166. Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which PubMatic, OpenX, and the Linked Data Brokers do.

167. Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference. "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers. An identity graph is used for real-time personalization and advertising targeting for millions of users."[100] This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law. An "identity graph provider" is therefore just a euphemism for "data broker."

---

[99] SHERMAN, *supra*, at 2.

[100] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

168. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[101] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[102] Thus, data brokers possess information that can identify users by name (in addition to a whole host of other information), and combine that information with information about users' hobbies, interests, and attributes.

169. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[103]

170. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[104] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S.

---

[101] SHERMAN, *supra*, at 2.

[102] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[103] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[104] SHERMAN, *supra*, at 1.

individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[105]

171. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[106]

172. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further

[105] *Id.*

[106] *Id.* at 9.

> driving up costs of goods and services (from insurance to housing) for minority groups.[107]

173. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks

**Figure 25:**




---

[107] *Id.*

174. In the modern age, these threats are far too real. For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or other personal details from online data broker services, according to court documents."[108]

175. Similarly, following the protests in Los Angeles this past summer:

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements that's collected and sold by everything from weather apps to data brokers.[109]

176. Of course, data brokers do not just track people for no reason; they do so because they have their trackers installed on users' browsers and are paid by website operators to do so. So, by installing the trackers of data brokers on users' browsers, Defendant is causing and putting its users in the crosshairs of the privacy harms noted above.

177. In addition, as noted above, data brokers like PubMatic, OpenX, and the Linked Data Brokers are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which is used by data brokers to track users across the Internet.[110]

---

[108] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

[109] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, POLITICO (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-trump-00400127

[110] *Id.* at 11.

178. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[111]

179. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[112]

180. This is a concept courts have faced before. For instance, as a court in this District recently noted regarding an "identity resolution product," such a product:

> identifies consumers, addresses, or households across multiple media by linking together separate datasets relating to individual customers. For example, the product might correlate an email address submitted online with publicly available property information associated with the same email address. This type of product enables clients to execute targeted marketing campaigns across different types of media.

*Adstra, LLC v. Kinesso, LLC*, 2025 WL 552050, at *2 (S.D.N.Y. Feb. 19, 2025); *see also* Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25 GEO. MASON L. REV. 102, 135 (2017) ("Connecting individuals to devices can, in fact, be accomplished quite easily.").

181. By collecting IP addresses and Device Metadata, data brokers like PubMatic, OpenX, and the Linked Data Brokers can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of

[111] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[112] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below. But ultimately, this is a process that Defendant facilities and benefits from.

182. As a result of Defendant's installation of the trackers of data brokers like PubMatic, OpenX, and the Linked Data Brokers on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).

183. These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses and Device Metadata linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the trackers of data brokers on Plaintiff's and Class Members' browsers, thus enabling Plaintiff and Class Members to be identified and de-anonymized by correlating their IP addresses and Device Metadata to comprehensive profiles.

*2. Real-Time Bidding*

184. Once data brokers like PubMatic, OpenX, and the Linked Data Brokers collect Website users' information and create or link that information to comprehensive user profiles, how do the data brokers "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

185. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[113]

186. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP, which is at least one function of the PubMatic Tracker here,[114] "work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the ADNXS Tracker is[115]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[116] And an Advertising Exchange—which OpenX provides[117]—"allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[118]

187. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

188. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP

[113] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[114] *See*, *e.g.*, PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[115] *Microsoft Invest*, Microsoft, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[116] Geoghegan, *supra*.

[117] *Introducing To Ad Serving*, Microsoft Ignite (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving ("Major ad exchanges include … OpenX").

[118] *Id*.

> address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[119]

**Figure 26:**




189. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs trackers of data brokers (like PubMatic and OpenX themselves and the Linked Data Brokers) on its users' browsers, and all of these trackers sync with each other to obtain complete user profiles:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP [or SSP] enlists a final actor, the data

[119] Geoghegan, *supra*; see also REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

> management platform (DMP) [or data brokers/identity graph provider]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[120]

**Figure 27:**




190. In other words, an SSP like PubMatic is able to solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information PubMatic knows about that user with the information Experian, Epsilon, TransUnion, and many other data brokers know about that user. If there is a match, then PubMatic will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

191. Likewise, a DSP like Microsoft is able to generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as

[120] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

possible, which it does by syncing with PubMatic and OpenX—who in turn, sync with each other and the Linked Data Brokers.

192. All of this enriches Defendant, as its users have now become more identifiable and more valuable thanks to the replete information the Third Parties are able to provide about users by syncing with the Linked Data Brokers.

193. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (i) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (ii) "send[ing] sensitive data across geographic borders."
>
> (iii) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[121]

194. Given Microsoft operates a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

[121] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

195. The Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[122]

196. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[123]:

**<u>Figure 28:</u>**




197. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law, and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted

[122] Geoghegan, *supra*.

[123] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Deivaprakash*, 2025 WL 2541952, at *4 (finding injury where data "collection allegedly allowed the third parties to: (1) build a profile reflecting [plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous.").

*3. Cookie Syncing*

198. It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs and uses their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

199. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[124] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[125]

[124] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[125] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

200. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[126]

[126] Papadopoulos, *supra*, at 1433.

**<u>Figure 29:</u>**




201. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[127]

202. On the flip side, "CSync may re-identify web users even after they delete their cookies."[128] "[W]hen a user erases her browser state and restarts browsing, trackers usually place

[127] Papadopoulos, *supra*, at 1434.

[128] *Id*.

and sync a new set of userIDs, and eventually reconstruct a new browsing history."[129] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[130]

203. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[131]

204. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are syncing their cookies with other third parties on the Website (*e.g.*, the Linked Data Brokers, the Third Parties between one another). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

* * *

205. To summarize the proceeding allegations, PubMatic and OpenX are data brokers, that focus on collecting as much information about Website users as possible to create comprehensive user profiles, and each of the Third Parties sync with the Linked Data Brokers that do the same thing. The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing,"

[129] *See id.*

[130] *Id.*

[131] *Id.* at 1441.

those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

206. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique IDs) with comprehensive user profiles.

207. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

208. Thus, Defendant is unjustly enriched through its installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lost the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

209. Further, because Defendant installs the Trackers on Plaintiff's and Class Members' browsers, the Third Parties continue to track Plaintiff and Class Members wherever they go online, thus building even more comprehensive user profiles over time that are provider to the third parties' other clients (or further enrich Defendant here).

**B. Defendant Uses The PubMatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

210. As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[132]

211. PubMatic helps companies like Defendant monetize the data of Website users. As noted above, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[133]

212. To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[134]

**<u>Figure 30:</u>**




[132] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us.

[133] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[134] *Id*.

213. Likewise, PubMatic provides identity resolution via the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[135] Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[136]

214. Notably, PubMatic also touts its ability to integrate with multiple other third parties—including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance"[137]:

**Figure 31:**




---

[135] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[136] *Id.*

[137] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-buyers/.

215. PubMatic also helps companies like Defendant "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[138] One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[139]

216. In other words, PubMatic utilizes third-party data, as well as data from the publisher like Defendant where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

217. By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[140] This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[141]

---

[138] CONNECT WITH PUBMATIC'S AUCTION PACKAGES, https://pubmatic.com/auction-packages.

[139] *Id*.

[140] RAMADAN AUCTION PACKAGE, https://pubmatic.com/auction-packages/us/ramadan-us/.

[141] *Id.*

**Figure 32:**




218. Thus, when users visit Defendant's Website, PubMatic records and decodes users' IP addresses, Device Metadata, and unique user ID (the KADUSERCOOKIE) through its PubMatic Tracker—as installed by Defendant—so that Defendant and PubMatic can identify users with PubMatic's suite of identity resolution services, sell Defendant's users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising PubMatic assists with. All of this helps Defendant monetize its Website and maximize revenue by enabling PubMatic to collect as much information about Defendant's users as possible.

### C. Defendant Uses The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization

219. Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers

looking to invest in upper-funnel buying and drive business results."[142] The ADNXS Tracker is a DSP as noted above.

220. Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[143]

221. In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.
>
> …
>
> Once we get the call, we overlay segment data from our server-side cookie store. Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data. We also contact third-party data providers and overlay any available data.
>
> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.
>
> …
>
> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft

[142] *About Microsoft Invest*, Microsoft (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

[143] *Id.*

> Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad.[144]

222. Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[145] To do this, Microsoft utilizes data from its cookie store. The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[146]

223. Microsoft also integrates with the PubMatic and OpenX Trackers on Defendant's Website to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users. And Microsoft discloses all this information to advertisers that bid on Defendant's users, regardless of whether the advertiser actually wins the bid.

224. Further, Microsoft utilizes data from its cookie store. The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[147]

225. In other words, when users visit Defendant's Website, Microsoft collects users' IP addresses, Device Metadata, and unique user identifier (the UUID2) through its ADNXS Tracker—as installed by Defendant—to provide to advertisers interested in showing an advertisement to Defendant's Website users, enriching that information by integrating with data brokers like PubMatic and OpenX, and ultimately enabling Defendant to monetize its Website and maximize revenue by enabling Microsoft to collect as much information about Defendant's users

---

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

as possible.

### D. Defendant Uses The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization

226. As noted above, OpenX is a registered data broker in California that claims to be "the world's leading independent supply-side platform for audience, data, and identity targeting."[148]

227. OpenX's proprietary identity resolution tool, OpenAudience, takes a company's "first-party data, or any pre-built audience segments, and seamlessly match[ing it] to [OpenX's] identity graph of more than 200 million unique people," allowing companies like Defendant to "package up audiences for marketers that will drive ad revenue."[149]

228. In other words, OpenX gathers the information of Defendant's Website users, such as IP addresses and Device Metadata, matches that data to any profile of the user in its own records, de-anonymizes the user by matching them to said profile, and offers up the user's profile for sale to advertisers. Indeed, OpenX notes it enables Defendant to match its "site visitors' data to third-party identifiers to create a unified, resolved view of your users" to "drive more revenue."[150]

229. OpenX's identity graph provides companies, like Defendant and the other Third Parties, access to 800 million hashed emails, 200 million hashed phone numbers, over 200 million U.S. users instrumented for data and identity, 48 million CTV users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 data attributes available for targeting.[151]

---

[148] ABOUT US, OPENX, https://www.openx.com/company/.

[149] OPENAUDIENCE, OPENX, https://www.openx.com/why-openx/openaudience/.

[150] PUBLISHERS, OPENX, https://www.openx.com/publishers/.

[151] OPENAUDIENCE, OPENX, https://www.openx.com/why-openx/openaudience/.

**Figure 33:**




230. OpenX also uses these individual profiles to provide marketers with curated packages that identify and target specific customers.[152] Indeed, OpenX notes it can "help you understand what audience segments are on your site and give you packages that your in-house team can take directly to marketers."[153]

231. OpenX splits this up into two different types of packages. The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers *wherever* and *whenever* they engage with their favorite content."[154] The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory. [Allowing companies, like Defendant to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[155]

---

[152] CURATED PACKAGES, OPENX, https://www.openx.com/curated-packages/.

[153] *Id.*

[154] *Id.* (emphasis added).

[155] *Id.*

232. By way of example, OpenX sells a "Cold & Flu Package" that targets consumers "looking to prevent and treat illness this cold and flu season."[156]

233. To do all of this, OpenX needs to collect data that identifies a particular user. This is why OpenX collects IP addresses and Device Metadata: it allows OpenX to link one of Defendant's Website users to any profile OpenX may have about that user, and OpenX can in turn provide that profile to interested advertisers for more targeted advertising. The IP address, Device Metadata, and unique identifiers also allow OpenX to track a user's Website activity over time (*i.e.*, through repeated Website visits) and to track that user on other websites.

234. Thus, when users visit Defendant's Website, OpenX collects users' IP addresses, Device Metadata, and unique user identifiers through its OpenX Tracker to build comprehensive user profiles, which are used to de-anonymize and identify Defendant's users, enrich Defendant's user data, and make those users more valuable to prospective advertisers by allowing advertisers to better target specific users. All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

## IV. PLAINTIFF'S EXPERIENCE

235. Plaintiff has regularly visited the Website on his desktop browser during the class period, including in March 2025.

236. When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Third Parties' Trackers to be installed on Plaintiff's browser. *See* Figures 4, 15, 19, *supra*. Defendant also caused the Linked Data Brokers' and various data sellers' trackers to be installed on Plaintiff's browser. *See* Figures 7, 9, 12, 20, 22, *supra*.

[156] COLD & FLU, OPENX, https://www.openx.com/curated-packages/cold-flu/

237. Through their respective Trackers, the Third Parties collected Plaintiff's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff by linking him to a user profile and synchronizing that profile amongst each other and with other entities. *See* Figures 5, 7-14, 16-18, 20-22, 24, 31, 33, *supra*.

238. Defendant and the Third Parties used the information collected by the Trackers to

(i) identity Plaintiff and either create a new profile of him or match Plaintiff to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile, such as the Linked Data Brokers)

(ii) sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website)

(iii) actually target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website)

(iv) de-anonymize Plaintiff and generate revenue from the sale of Plaintiff's information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

239. For example, as described above, Defendant installed the PubMatic Tracker on Plaintiff's browser. As the below screenshot of traffic from Plaintiff's browser shows, that Defendant was using the PubMatic Tracker to fill a "banner" advertising space on the Website.[157]

[157] "Banners are the creative rectangular ads that are shown along the top, side, or bottom of a website in hopes that it will drive traffic to the advertiser's proprietary site, generate awareness,

The dimensions of the banner ad are listed as pixels—the values for the "h" (height) and "w" (width) parameters. PubMatic received a bid response[158] from Jaguar Land Rover to show Plaintiff an advertisement for approximately $11.99 CPM. CPM stands for "cost per mille," which "is a pricing model used in digital advertising, where advertisers pay the publisher a fixed price for 1,000 impressions of their ad—'mille' being Latin for 'thousand.' An impression is achieved when an ad loads on the page or app and is viewed by the user."[159]

**Figure 34:**


```
"id": "1743285634758579_6",
"seatbid": [{
    "bid": [{
        "id": "C1AE0E50-E862-4E5B-A826-C83328D2D4E0",
        "impid": "9",
        "price": 11.990836,
        "adm": "<span class=\"PubAPIAd\"  id=\"C1AE0E50-I
        "adomain": ["jaguarlandrover.com"],
        "iurl": "http://googleads.g.doubleclick.net/dbm/a
        "cid": "23025",
        "crid": "638810666",
        "dealid": "130202511PM1030",
        "h": 480,
        "w": 1920,
        "mtype": 1,
        "ext": {
            "dspid": 80,
            "wDSPByrId": "2524534",
            "advid": 703417,
            "deal_channel": 1,
            "bidtype": 0
```


240. In other words, by installing and using the Third Parties' Trackers, Defendant and the Third Parties (i) identified Plaintiff by tying the information collected from him on the Website

and overall brand consideration." WHAT IS BANNER ADVERTISING?, https://advertising.amazon.com/library/guides/banner-advertising.

[158] "A bid response is the advertiser's response to a publisher's bid request. When an advertiser decides that ad inventory offered via a bid request suits their criteria, they can respond with a bid through the RTB system. This bid response will include details about the bid as well as information on the ad campaign and the bidder." BID RESPONSE, SMARTCLIP, https://smartclip.tv/adtech-glossary/bid-response/.

[159] COST PER MILLE (CPM), https://www.appsflyer.com/glossary/cpm/

to profiles maintained by the Third Parties and/or the Linked Data Brokers; and (ii) offered him data up for sale to interested advertisers through the real-time bidding process, for which at least one advertiser was willing to pay Defendant $11.99 for Plaintiff's data.

241. Plaintiff did not provide his prior consent to Defendant to install or use the Trackers on his browser. Nor did Defendant obtain a court order before installing or using the Trackers.

242. Thus, Plaintiff has had his privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff's data.

243. Accordingly, Plaintiff has been injured by Defendant's violation of the CIPA.

## CLASS ALLEGATIONS

244. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

245. The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

246. **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member

of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

247. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a) Whether Defendant violated CIPA section 638.51(a);

(b) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(c) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(d) Whether Defendant sought or obtained a court order for its use of the Trackers; and

(e) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

248. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

249. **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to

prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

250. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 638.51(a)

251. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

252. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

253. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

254. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

255. The Trackers are "pen registers" because they are "device[s] or process[es]" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and Class Members' computers or smartphones. Cal. Penal Code § 638.50(b); *see also Lesh*, 767 F. Supp. 3d at 40-42.

256. Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that are being used to ascertain the identity of visitors to Defendant Website, and are thus capturing "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

257. At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed the Third Parties to record or decode Plaintiff's and Class Members' IP addresses and Device Metadata. The Trackers also set a unique user identifier on Plaintiff's and Class Members' browsers so the Third Parties could de-anonymize Plaintiff and Class Members and track them across multiple Website sessions and multiple websites.

258. Defendant and the Third Parties used the information collected by the Trackers to:

(i) identity Plaintiff and Class Members and either create new profiles of them in the Third Parties' databases or match Plaintiff and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(ii) sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website);

(iii) actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website); and

(iv) (de-anonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

259. The Trackers do not collect the contents of Plaintiff's and Class Members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

260. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers. Nor did Defendant obtain a court order to install or use the Trackers.

261. Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e) For pre- and post-judgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief; and

(g) For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: October 16, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150

Facsimile: (212) 989-9163
E-mail: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*