**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY D'ANTONIO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABLE NEWS NETWORK, INC.,<br><br>Defendant. | Case No. 1:24-cv-03132-VM<br><br>Hon. Victor Marrero |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Dated: January 20, 2026

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................ 3

I. AS DEFENDANT CONCEDED, D'ANTONIO HAS ALLEGED A CONCRETE INJURY SUFFICIENT FOR ARTICLE III STANDING ........................................ 3

A. Defendant's Installation And Use Of The Trackers Facilitated The Profiling Of D'Antonio And The Widespread Dissemination Of That Profile To Advertisers Without Consent ........................................ 3

B. Defendant Was Unjustly Enriched Through Its Installation And Use Of The Trackers ........................................ 6

C. Defendant's Factual Arguments Are Unpersuasive ........................................ 7

D. Defendant's Legal Authorities Are Inapposite ........................................ 9

E. Defendant Conceded Standing By Removing This Action To Federal Court And Availing Itself Of Federal Jurisdiction ........................................ 14

F. To The Extent The Court Remands This Case (And It Should Not), D'Antonio Should Be Awarded Fees And Costs ........................................ 15

II. AS THIS COURT PREVIOUSLY HELD, D'ANTONIO PLAUSIBLY ALLEGES A VIOLATION OF CIPA § 638.51 ........................................ 16

A. As Courts Have Held, The Trackers Did Not Record The "Contents" Of D'Antonio's Communications ........................................ 17

B. As Courts Have Held, The Trackers Are "Pen Registers" Because They Recorded D'Antonio's "Addressing" Information ........................................ 19

C. As Courts Have Held, Using The Trackers For Identity Resolution And Advertising Is Not "Operating, Maintaining, Or Testing" An Electronic Communication Service ........................................ 22

D. As Courts Have Held, The CIPA And CCPA Do Not Conflict ........................................ 25

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**


*Aviles v. LiveRamp, Inc.*,
2025 WL 487196 (Los Angeles Super. Ct. Jan. 28, 2025) .......... 20

*Bradshaw v. Lowe's Cos., Inc.*,
2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) .......... 1, 16

*Camplisson v. Adidas Am., Inc.*,
2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) .......... Passim

*Carolus v. Nextstar Meda Inc.*,
2025 WL 1338193 (N.D. Cal. Apr. 9, 2025) .......... 10

*Casillas v. BOP LLC*,
2025 WL 2161288 (Los Angeles Super. Ct. June 18, 2025) .......... 24

*Casillas v. Calvin Klein, Inc.*,
2025 WL 3529009 (Los Angeles Super Ct. Nov. 25, 2025) .......... 18

*Casillas v. Transitions Optical, Inc.*,
2024 WL 4873370 (Los Angeles Super. Ct. Sept. 9, 2024) .......... 24

*Collier v. SP Plus Corp.*,
889 F.3d 894 (7th Cir. 2018) .......... 16

*Dawidzik v. Tesla, Inc.*,
2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) .......... 13

*de Ayora v. Inspire Brands, Inc.*,
2025 WL 3707561 (N.D. Cal. Dec. 22, 2025) .......... 1, 10, 19

*Deivaprakash v. Condé Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) .......... Passim

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) .......... 4

*DellaSala v. Samba TV, Inc.*,
2025 WL 3034069 (N.D. Cal. Oct. 30, 2025) .......... 14

*Dept. of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989) .......... 5

*Doe v. Talkiatry Management Servs., LLC*,
2025 WL 3190813 (C.D. Cal. Oct. 1, 2025) .......... 20

*Drummer v. Costar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) .......... Passim

*Echeverria-Corzan v. Fox Corp.*,
2025 WL 3128194 (N.D. Cal. Nov. 7, 2025) .......... 2, 17

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 5

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... Passim

*Gabrielli v. Haelon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .......... 19

*Gabrielli v. Insider, Inc.*,
2025 WL 522515 (S.D.N.Y. Feb. 18, 2025) .......... 13

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) .......... 4, 23

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) .......... 21, 22

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... Passim

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 6, 20

*Heiting v. FKA Distributing Co.*,
2025 WL 736594 (C.D. Cal. Feb. 3, 2025) .......... 10, 17, 20

*Heiting v. Harpercollins Publishers LLC*,
2025 WL 1780936 (Los Angeles Super. Ct. May 15, 2025) .......... 12

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 5

*In re Google RTB Consumer Privacy Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... 6

*In re Jetblue Airways Corp. Privacy Litig.*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005) .......... 22

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) .......... 19

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023).......... 2, 14

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 4

*Khamooshi v. Politico LLC*,
2025 WL 2822879 (N.D. Cal. Oct. 2, 2025).......... 12

*Khatskevich v. Shapiro*,
2025 WL 833872 (S.D.N.Y. Mar. 17, 2025).......... 11

*Knight v. Patagonia, Inc.*,
2025 WL 346465 (C.D. Cal. Jan. 30, 2025).......... 3, 15

*League of Women Voters of Pennsylvania v. Commonwealth of Pennsylvania*,
921 F.3d 378 (3d Cir. 2019).......... 16

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) .......... Passim

*Lewis v. Magnite, Inc.*,
2025 WL 3687546 (C.D. Cal. Dec. 4, 2025).......... 26

*Linenberry v. AddShoppers, Inc.*,
2025 WL 1533136 (N.D. Cal. May 29, 2025) .......... 10

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024) .......... 5

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 22, 25, 26

*Mitchener v. CuriousityStream, Inc.*,
2025 WL 2272413 (N.D. Cal. Aug. 6, 2025).......... 12, 18

*Moody v. C2 Educational Systems Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. July 25, 2024) .......... 17, 23

*Penning v. MedicineNet, Inc.*,
2025 WL 2814586 (N.D. Cal. Oct. 3, 2025) ........ 11

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 9, 10

*Price v. Converse, Inc.*,
2025 WL 3295119 (C.D. Cal. Sept. 30, 2025) ........ 12

*Price v. Headspace, Inc.*,
2025 WL 1237977 (Los Angeles Super. Ct. Apr. 1, 2025) ........ 18

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ........ 8

*Rodriguez v. Autotrader.com*,
762 F. Supp. 3d 921 (C.D. Cal. Jan. 8, 2025) ........ 23, 24

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) ........ 11

*Rodriguez v. Culligan Int'l Co.*,
2025 WL 3064113 (S.D. Cal. Nov. 3, 2025) ........ 11

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Los Angeles Super. Ct. Sept. 24, 2025) ........ 1, 25

*Scarlett v. Future US, LLC*,
2025 WL 2614587 (San Francisco Super. Ct. Sept. 5, 2025) ........ 1, 11, 17, 19

*Scharon v. Paramount Global*,
2025 WL 2996812 (Los Angeles Super. Ct. Oct. 3, 2025) ........ 26

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. Oct. 21, 2024) ........ 20, 24

*Six v. IQ Data Int'l, Inc.*,
129 F.4th 630 (9th Cir. 2025) ........ 8

*United States ex rel. Godecke v. Kinetic Concepts, Inc.*,
2016 WL 11673222 (C.D. Cal. Nov. 16, 2016) ........ 15

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) ........ 23

*Wiley v. Univ. Music Grp., Inc.*,
2025 WL 3654085 (N.D. Cal. Dec. 17, 2025) .......... 19

*Wright v. TrueCare Property Holdings, LLC*,
2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) .......... 20

*Xu v. Reuters News & Media Inc.*,
2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) .......... 13

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Santa Clara Super. Ct. Oct. 24, 2025) .......... Passim

*Zanotti v. Invention Submission Corp.*,
2020 WL 2857304 (S.D.N.Y. June 2, 2020) .......... 14

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) .......... 22

**STATUTES**

28 U.S.C. § 1447(c) .......... 3, 16

Cal. Civ. Code § 1798.100(a) .......... 25

Cal. Civ. Code § 1798.140(v)(1)(A) .......... 9

Cal. Civ. Code § 1798.175 .......... 26

Cal. Pen. Code § 638.51 .......... 21, 22, 23

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 3, 14

Fed. R. Civ. P. 12(h)(3) .......... 15

Plaintiff Anthony D'Antonio ("D'Antonio") respectfully submits this Opposition to Defendant Cable News Network, Inc.'s ("Defendant") Motion to Dismiss the Second Amended Complaint ((ECF No. 74) (hereinafter, the "Motion" or "MTD").

## INTRODUCTION

Defendant is correct that the landscape is not the same as a year ago: it has moved decisively *against* Defendant and reinforced the correctness of this Court's prior ruling. The federal judiciary has overwhelmingly found allegations like D'Antonio's to plausibly state a violation of CIPA § 638.51. *See*, *e.g.*, *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *2 (N.D. Cal. Oct. 9, 2025) ("Several judges in th[e] [Northern] [D]istrict [of California], including Judges Lin, Orrick, Pitts, Ryu, Tigar, and [Breyer], have held that such allegations suffice at the pleading stage."); *Bradshaw v. Lowe's Cos., Inc.*, 2025 WL 3171740, at *7 (S.D. Cal. Nov. 12, 2025) ("[T]he case law is not in Defendants' favor. Indeed, it uniformly supports the opposite outcome."); *de Ayora v. Inspire Brands, Inc.*, 2025 WL 3707561, at *8 (N.D. Cal. Dec. 22, 2025) ("[T]his Court follows a growing number of colleagues and finds … Plaintiffs have sufficiently stated a claim."). Recent state court opinions have followed suit. *See*, *e.g.*, *Xu v. Reuters News & Media, Inc.*, 2025 WL 3035016, at *3 (Santa Clara Super. Ct. Oct. 24, 2025) ("*Xu II*"); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *3 (Los Angeles Super. Ct. Sept. 24, 2025); *Scarlett v. Future US, LLC*, 2025 WL 2614587, at *4 (San Francisco Super. Ct. Sept. 5, 2025).

Of course, this Court already found the PubMatic Tracker[1] was a "pen register" under the CIPA. *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 38, 40-41 (S.D.N.Y. 2025) (Marrero, J.). But courts evaluating similarly comprehensive allegations D'Antonio's have found *all three* of the alleged Trackers at issue to be "pen registers." *Deivaprakash v. Condé Nast Digital*, 798 F.

[1] All terms not defined herein shall have the same meaning as in the SAC.

Supp. 3d 1100, 1105-06 (N.D. Cal. 2025) (PubMatic Tracker); *Fregosa*, 2025 WL 2886399, at *1, *6 (ADNXS and PubMatic Trackers); *Xu II*, 2025 WL 3035016, at *1, *3-4 (same); *Echeverria-Corzan v. Fox Corp.*, 2025 WL 3128194, at *1 (N.D. Cal. Nov. 7, 2025) (OpenX Tracker).

Similarly, although Defendant proffers that courts have filtered allegedly identical "factual allegations through the teeth of *TransUnion*" (MTD at 1), Defendant's Article III argument is all bark and no bite. This case is not just about "a third party recorded my IP address." It is about how, through Defendant's installation and use of Trackers, the Third Parties collected various identifiers from Website users (*e.g.*, IP addresses, Device Metadata, unique user identifiers), used those to match consumers to comprehensive, non-anonymous profiles, and sold those profiles for Defendant's benefit to advertisers in the span of milliseconds. *See*, *e.g.*, SAC ¶¶ 4, 7, 52-54, 62, 74, 77-79, 84-89, 92-96, 113, 132-133, 138-140, 144, 151-155, 164, 169, 177-181, 188-189, 193, 196, 199, 204-209, 214-218, 222-225, 229-234, 238-240. Such allegations are encompassed by D'Antonio's CIPA claim, and courts have regularly concluded such conduct gives rise to Article III standing. *See*, *e.g.*, *Deivaprakash*, 798 F. Supp. 3d at 1107, 1107 n.4; *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026); *Camplisson v. Adidas Am., Inc.*, --- F. Supp. 3d ---, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025). Complaints including less detail and less expansive allegations are highly distinguishable.

Yet, this case is different in a significant way from an Article III standpoint: Defendant chose to be in federal court. Former plaintiff Lesh brought this action in the California Superior Court for Alameda County (*i.e.*, state court). ECF No. 1-1. It was Defendant who removed this case to federal court (ECF No. 1), thereby asserting there was federal jurisdiction over this case, including Article III standing. *See*, *e.g.*, *Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023) ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant

as the party invoking federal jurisdiction.") (cleaned up). And it was Defendant that availed itself of federal jurisdiction to (i) transfer this action from the Northern District of California to this Court (ECF No. 9), and (ii) move to dismiss this case on Fed. R. Civ. P. 12(b)(6) (but not 12(b)(1)) grounds (ECF No. 32).

As D'Antonio lays out below, Defendant's change of heart on the issue has nothing to do with a change in the law. No such change has occurred. Instead, it is based on Defendant's desire to get away from this Court following an adverse ruling on the prior Motion to Dismiss because its "chosen forum" did not work to its advantage. In other words, "Defendant's litigation strategy smacks of forum-shopping." *Knight v. Patagonia, Inc.*, 2025 WL 346465, at *3 (C.D. Cal. Jan. 30, 2025). The Court should not countenance Defendant's behavior. If the Court decides to remand this case to Alameda Superior Court (and it should not), D'Antonio should be awarded attorney's fees and costs. 28 U.S.C. § 1447(c).

For the following reasons, Defendant's Motion should be denied.

## ARGUMENT

### I. AS DEFENDANT CONCEDED, D'ANTONIO HAS ALLEGED A CONCRETE INJURY SUFFICIENT FOR ARTICLE III STANDING

#### A. Defendant's Installation And Use Of The Trackers Facilitated The Profiling Of D'Antonio And The Widespread Dissemination Of That Profile To Advertisers Without Consent

Through the information the Third Parties collect, D'Antonio alleges: (1) he and class members are identified by being linked to comprehensive, non-anonymous profiles maintained by data brokers using the IP addresses, Device Metadata, and unique identifiers collected directly from users on the Website; (2) that such linkage occurs by bypassing the normal "restriction that sites can't read each other[s'] cookies"; and (3) that those profiles are offered up for sale to a near endless supply of advertisers without knowledge or consent. *See*, *e.g.*, SAC ¶¶ 4, 7, 52-54, 62, 74,

77-79, 84-89, 92-96, 113, 132-133, 138-140, 144, 151-155, 164, 169, 177-181, 188-189, 193, 196, 199, 204-209, 214-218, 222-225, 229-234, 238-240.

Many courts have found these allegations satisfy Article III "because the privacy violation extends beyond the collection of just [D'Antonio's] IP address and metadata; it encompasses how that collection allegedly allowed the third parties to: (1) build a profile reflecting his personal information; and (2) interfere with his ability to remain anonymous." *Deivaprakash*, 798 F. Supp. 3d at 1107, 1107 n.4; *see also*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, 2025 WL 2779193, at *2 (N.D. Cal. Sept. 30, 2025) ("Deivaprakash alleges that internet trackers allowed third parties to generate profiles reflecting his personal information. That privacy injury finds historical analogues in injuries redressable under the common law."); *Gilligan*, 2026 WL 32259, at *2 (finding Article III standing where plaintiffs "have adequately alleged that they were subject to these profile-building practices"); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("Gabrielli's allegations that Motorola deprived him control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Camplisson*, 2025 WL 3228949, at *6 (finding Article III standing "Plaintiffs have alleged that the Trackers on Defendant's website have collected a broad set of their personal identifying and addressing information without their consent and in violation of CIPA. This claim maintains a violation of privacy, particularly in the control of their own information."); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (same based on "Oracle's ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up).

In this way, D'Antonio and others lost their right to "control [] information concerning his or her person," which is encompassed within "both the common law and the literal understandings

of privacy." *Dept. of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989). This is at least analogous to the tort of intrusion upon seclusion, although as Defendant admits, an exact match is not required (MTD at 8). *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025) ("[T]he harm made actionable at common law was an individual's loss of control over her private affairs or concerns by an interloper's tortious intentional interference.") (cleaned up); *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *13 (N.D. Cal. Sept. 30, 2025) ("[T]he Court concludes the better reading of *TransUnion* is that harms need only be similar in kind to those redressed by common law torts. That is because *TransUnion* expressly rejected the notion that an 'exact duplicate' is required….").

Moreover, D'Antonio's harm is traceable to Defendant's conduct. Defendant is alleged to have "enabled the third parties to amass information about [D'Antonio] by embedding the code in its website[] that surreptitiously installed the trackers on [D'Antonio's] browser in the first place." *Deivaprakash*, 798 F. Supp. 3d at 1107; *Xu II*, 2025 WL 3035016, at *3 ("[I]t appears Defendant does not account for Plaintiff's allegation that it was responsible for the installation of the Trackers."); *see*, *e.g.*, SAC ¶¶ 26, 28, 59-60, 67, 75, 80, 90, 107, 128, 134, 146. Indeed, the Third Parties' tracking was not only done at Defendant's direction, but for Defendant's financial benefit as well (*i.e.*, advertising revenue). *See*, *e.g.*, SAC ¶¶ 79, 89, 96, 98, 118, 144, 155, 164, 176, 183, 192, 206-208, 218, 225, 234. And the harm that befell D'Antonio here—the linkage to non-anonymous profiles and the continued building of the same, the sale of those profiles to unlimited numbers of advertisers—occurred directly on Defendant's Website. *See*, *e.g.*, *id.* ¶¶ 75, 81, 90, 97, 114-116, 135, 146, 238-240.

Defendant's "knowing participation in this scheme … is enough to confer standing for a victim of the scheme to sue [Defendant] in federal court." *McClung v. AddShopper, Inc.*, 2024

WL 189006, at *2 (N.D. Cal. Jan. 17, 2024). Thus, by facilitating the creation and widespread sale of profiles through its installation and use of the Trackers, Defendant caused D'Antonio to suffer a concrete harm.

**B. Defendant Was Unjustly Enriched Through Its Installation And Use Of The Trackers**

As another basis for standing, D'Antonio alleges that Defendant derived an unlawful economic benefit through its installation and use of the Trackers. Specifically, D'Antonio alleges that by installing and using the Trackers, D'Antonio's information was collected by the Third Parties without consent; the Trackers de-anonymized D'Antonio, which enabled his information to be sold to advertisers for a higher value than it otherwise would have been; and that Defendant derived a profit from these unlawful sales. SAC ¶ 206 ("[T]he Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Websites (e.g., IP addresses, Device Metadata, unique IDs) with comprehensive user profiles."); *see also*, *e.g.*, *id.* ¶¶ 79, 89, 96, 98, 118, 144, 155, 183, 206-209, 218, 225, 234, 238-240. D'Antonio includes allegations showing his information was bid on by at least one advertiser on the Website, who he alleges bid more than it otherwise would have because of D'Antonio's linkage to comprehensive profiles vis-à-vis the Trackers. *Id.* ¶¶ 239-240.

This also suffices for injury. *See*, *e.g.*, *Drummer v. Costar Grp., Inc.*, 2025 WL 3190656, at *3 (C.D. Cal. Oct. 22, 2025) ("Plaintiffs also allege that this collection and transmission economically harms Plaintiffs, because such data underpinning targeted advertising is economically valuable."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1038 (S.D. Cal. 2023) (Article III standing alleged where "Plaintiff … conferred a benefit on Defendant through the use and dissemination of Plaintiff's … personal information … which Defendant used and disseminated for its own monetary benefit.") (cleaned up); *In re Google RTB Consumer Privacy*

*Litig.*, 606 F. Supp. 3d 935, 941, 943 (N.D. Cal. 2022) (finding Article III standing where "[t]hrough RTB, Google solicits participants to bid on sending an ad to a specific individual" and "Google provides highly specific information about the target in the bid request … including data that identifies the individual being targeted through unique identifiers, device identifiers, geolocation, IP address, cookie match, and other information").

**C. Defendant's Factual Arguments Are Unpersuasive**

Against this backdrop, Defendant's arguments are easily disposed of. *First*, Defendant argues D'Antonio "does not allege that he actually received any targeted advertising, much less that he was concretely harmed by such advertising," and that the advertising was based on "the device used by Plaintiff to visit the CNN Website." MTD at 9, 9 n.4 (cleaned up). To the contrary, D'Antonio alleges he was "actually target[ed] [] with … and serve[d] advertisements … based on the information collected by the Third Parties on the Website *and the information contained on any profiles of Plaintiff* (which are linked to Plaintiff via the information collected by the Third Parties on the Website)." SAC ¶ 238 (emphasis added). So, D'Antonio alleges he was actually targeted with advertisements, and that those advertisements were based on a profile of his personal information, demographics, and interests (which he was linked to based on the information recorded by the Trackers), *not* based on his browser. *See*, *e.g.*, *id.* ¶¶ 78, 84-87, 94, 140, 151-154, 168-169, 179, 205, 214-217, 229-232.

In addition, D'Antonio alleges that at least one advertiser—Jaguar Land Rover—paid approximately $12 CPM to show an advertisement to D'Antonio based on his profile. SAC ¶ 239. But the point is not that D'Antonio was shown a targeted advertisement, as that is but a symptom

of his harm.[2] Rather, D'Antonio alleges that Jaguar Land Rover was likely one of hundreds of advertisers to whom D'Antonio's profile—linked to him via the information collected by the Trackers on the Website—was broadcast without his knowledge and consent, and who were willing to pay Defendant money to show him an advertisement. *See*, *e.g.*, *id.* ¶¶ 188, 193, 238, 240. Indeed, the harm is only amplified by the fact that numerous entities and advertisers who did not pay enough to show D'Antonio an advertisement still received his information. *Id.* In this manner, Defendant's conduct perpetrates what "some have characterized … as the biggest data breach ever recorded because of the she[e]r number of entities that receive personal information." *Id.* ¶ 196 (cleaned up). Thus, "the harm [D'Antonio] allege[s]—the surreptitious collection and transmission of [his] economically valuable IP address[] [and other information] for purposes of targeted tracking—is not dependent on whether [he] actually *received* targeted advertisements." *Drummer*, 2025 WL 3190656, at *4 (emphasis in original).

*Second*, Defendant argues that none of the information disclosed here actually identifies D'Antonio. *See* MTD at 8 ("Plaintiff does not plausibly allege that the disclosure or intrusion revealed his identity…"). Of course, to the extent that standing depends on whether D'Antonio's information identifies him, that is a question of fact not suitable for resolution at this juncture. *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *4 (N.D. Cal. Mar. 28, 2025) ("Resolution of the standing issue is "intertwined with an element of the merits of plaintiff's claim" and cannot be resolved under the summary judgment standard."). As it stands though, D'Antonio alleges that the Third Parties use the information recorded on the Website (IP addresses, Device Metadata, and unique user identifiers) to match D'Antonio to non-anonymous profiles held by data brokers that

---

[2] That said, and contrary to Defendant's argument (MTD at 9), "[c]ourts have consistently found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion." *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025).

contain his name, e-mail address, and the like (*i.e.*, that identify him). *See*, *e.g.*, SAC ¶¶ 54, 74, 78, 84-86, 93-94, 138, 140, 179-180, 189, 205, 214, 229. In this way, the various identifiers the Trackers record act as "keys" that match users to profiles identifying them (along with a host of other information). Perhaps that is why both California and the European Union consider IP addresses to be "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal Civ. Code § 1798.140(v)(1)(A); *see also* SAC ¶¶ 55-56. In any event, the information recorded from D'Antonio on the Website thus identifies—or is used to identify—him.

**D. Defendant's Legal Authorities Are Inapposite**

Defendant relies on a host of off-point caselaw. Defendant begins its argument by citing to *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025). But "[t]he scope of the alleged tracking in this case is materially more invasive than the limited tracking at issue in" *Popa*. *Gilligan*, 2026 WL 32259, at *2. *Popa* involved "the tracking of plaintiff's non-sensitive interactions with a single website." *Id*. Moreover, the information recorded in *Popa* was anonymous because the website had configured the third party software to exclude the user's "street number and zip code." *Popa*, 153 F.4th at 787, 787 n.1. Thus, the information tracked in *Popa* concerned only "how the plaintiff interacted with the site rather than her personal, private information." *Camplisson*, 2025 WL 3228949, at *6. In addition, the only use of the information in *Popa* was to tell websites "which elements … have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website." *Popa*, 153 F.4th at 786 (cleaned up).

*Popa* thus boiled down to a third party collecting anonymous information that was used in a manner akin to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems." *Id.* at 791. Unlike here, there was no linkage of information to non-anonymous profiles, no sale of that information to advertisers, and no loss of control of personal

information because personal information was not captured in *Popa*. *Camplisson*, 2025 WL 3228949, at *6 ("[*Popa*] is distinguishable from the facts presented in this case, where the collection of Plaintiffs' information concerns their person, is much broader in scope, and has been found to be a privacy harm in a wide variety of cases."); *de Ayora*, 2025 WL 3707561, at *2 ("[T]he alleged information at issue here is beyond what would be observable to a store clerk tasked with monitoring shoppers.").

Two of Defendant's other authorities are easily disposed of. In *Carolus v. Nextstar Meda Inc.*, 2025 WL 1338193, at *1 (N.D. Cal. Apr. 9, 2025), the court acknowledged that the "disclosure of several types of personal information all linked together," in addition to "IP addresses," could give rise to Article III standing. The court found that the plaintiffs' allegations of "browser and device data and other identifying information" were too vague "to analyze." *Id.* Those stand in stark contrast to D'Antonio's more specific allegations of linkage to profiles using the recorded information, and what those profiles contain. *See*, *e.g.*, SAC ¶¶ 54, 74, 78, 84-86, 93-94, 138, 140, 179-180, 189, 205, 214, 229; *see also Linenberry v. AddShoppers, Inc.*, 2025 WL 1533136, at *4 (N.D. Cal. May 29, 2025) (finding standing where "AddShoppers' database shows that it tracked Lineberry's browsing on sites like MedTerra and CatPerson and sent her promotional emails about products she had viewed on those sites"). Defendant also cites to *Heiting v. FKA Distributing Co.*, 2025 WL 736594 (C.D. Cal. Feb. 3, 2025). But that court later found standing where the plaintiff's later allegations were more specific, like D'Antonio's here. *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *2 (C.D. Cal. May 15, 2025) ("Plaintiff's SAC now alleges that the software effectively de-anonymizes the website user and has collected tracking information on her irrespective of her lack of a TikTok account.").

*Rodriguez v. Culligan Int'l Co.*, 2025 WL 3064113 (S.D. Cal. Nov. 3, 2025) is a procedural mess and of limited persuasive value. On the one hand, the plaintiff was a "tester" (*id.*, at *1), meaning the plaintiff "visited and entered information into Defendant's website expecting the information to be accessed, recorded, and disclosed." *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1085787, at *1 (C.D. Cal. Apr. 4, 2025) (discussing same plaintiff). On the other hand, the defendant "removed the action to" federal court (*Culligan Int'l Co.*, 2025 WL 3064113, at *1), thereby asserting there was federal jurisdiction over this case, including Article III standing. *See* Argument § I.E, *infra*.[3] Thus, *Culligan* involved a plaintiff who could not have standing in a privacy case by virtue of being a "tester," and a defendant who nonetheless asserted there was standing by removing the case to federal court.

Defendant claims its remaining authorities based their holdings on "identical allegations." MTD at 9 (cleaned up). Even a cursory review of the complaints in those actions (Roberts Decl. Exs. 1-5) shows Defendant's argument is disingenuous.[4] *Drummer*, 2025 WL 3190656, at *4 n.1 ("[A]t least some of these state cases appear to be based on far less comprehensive complaints than those submitted by Plaintiffs."); *Scarlett*, 2025 WL 2614587, at *1 ("The court is unable to compare the adequacy of the allegations in the complaints as to which demurrers were sustained with the detailed FAC.").

---

[3] Unlike here, the plaintiff in *Culligan* appeared to not make the argument that it was improper for the defendant to "tr[y] to have it both ways by asserting, then immediately disavowing, federal jurisdiction." *Penning v. MedicineNet, Inc.*, 2025 WL 2814586, at *3 (N.D. Cal. Oct. 3, 2025). Neither did the plaintiff in *Khamooshi*.

[4] Each of these publicly-filed complaints are subject to judicial notice. *Khatskevich v. Shapiro*, 2025 WL 833872, at *6 (S.D.N.Y. Mar. 17, 2025) ("A court may take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases.").

Defendant also cites to *Mitchener v. CuriousityStream, Inc.*, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025). But that case did not involve "the creation of a detailed profile and [the plaintiff's] reduced capacity to remain anonymous." *Deivaprakash*, 798 F. Supp. 3d at 1107 (distinguishing *Mitchener*). Although the plaintiffs in *Mitchener* alleged the defendant "*could* gain additional information about a visitor such as name, date of birth, and address," the plaintiffs failed to allege those pieces of information were disclosed as to them. *Mitchener*, 2025 WL 2272413, at *5 (emphasis in original; otherwise cleaned up). A cursory review of that complaint (Roberts Decl. Ex. 4) makes this evident, as the complaint contains nothing more than a few vague allegations pled by a firm known for cookie-cutter, "tester" litigation. *Heiting v. Harpercollins Publishers LLC*, 2025 WL 1780936, at *12 (Los Angeles Super. Ct. May 15, 2025) (in case filed by same law firm as *Mitchener*, "Plaintiff visited and tested the chat box for CIPA violations of more than 50 different websites"). The complaint at issue in *Price v. Converse, Inc.*, --- F. Supp. 3d ---, 2025 WL 3295119 (C.D. Cal. Sept. 30, 2025), was virtually identical to the one in *Mitchener*. *Compare* Roberts Decl. Ex. 4 *with id.* Ex. 5. Thus, although *Price* made vague allegations about profiling and identity resolution, she did so, unlike here, "at a high level of generality" and without reference to any injury that bore a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.*, at *3 (cleaned up).

Similarly, *Khamooshi v. Politico LLC*, 2025 WL 2822879, at *2 (N.D. Cal. Oct. 2, 2025), based its holding on the disclosure of various types of information like "geolocation data, device type, browser type, and 'device fingerprints,'" but without linkage to comprehensive profiles that were sold to advertisers. The *Khamooshi* complaint contained broad and generic allegations regarding profiling and real-time bidding (*see*, *e.g.*, Roberts Decl. Ex. 3 ¶¶ 32, 49, 76, 82, 93), but nowhere near the same level of detail D'Antonio alleges here regarding how those profiles are

built, what information they contain, and how those profiles are shared and monetized. *See* Argument §§ I.A-B, *supra*.

Last, D'Antonio's counsel is guilty of this lack of detail in the complaints in *Xu v. Reuters News & Media Inc.*, 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) ("*Xu I*"), and *Gabrielli v. Insider, Inc.*, 2025 WL 522515 (S.D.N.Y. Feb. 18, 2025). But the subsequent history of those cases is instructive. In the initial complaints, the *Xu* and *Insider* plaintiffs alleged only the collection of their IP addresses with allegations about how the collected information could identify users. Roberts Decl. Exs. 1-2. But when the *Xu* plaintiff refiled his case in state court with similar allegations to those here (*id.* Ex. 6), the court had no trouble finding standing. *Xu II*, 2025 WL 3035016, at *3 ("Plaintiff alleges that the collected information was used to build a profile for users based on their information, interests, and interferences. Therefore, whether Plaintiff has a reasonable expectation of privacy to the collected information does not preclude him from alleging an invasion of privacy injury.") (cleaned up). Likewise, when a different plaintiff brought allegations against Insider that were similar to those here (Roberts Decl. Ex. 7), Insider (represented by the same counsel) removed the action to federal court. *Id.* ¶ 9. Thus, Insider has asserted that allegations like D'Antonio's are sufficient for Article III standing. In sum, the Court should not be constrained by other cases where the allegations at issue were far less robust.[5]

[5] On reply, D'Antonio expects Defendant to cite to *Dawidzik v. Tesla, Inc.*, 2025 WL 3786963 (C.D. Cal. Dec. 29, 2025). That court overlooked plaintiff's allegations that his information was used to de-anonymize users and facilitate profiling and advertising. Thus, "it does not matter whether [Plaintiff] had a reasonable expectation of privacy in the information collected because the privacy violation extends beyond the collection of just his IP address and metadata." *Deivaprakash*, 798 F. Supp. 3d at 1106-07 (cleaned up). However, the plaintiff there also only gave a general overview of how real time bidding and linkage to data broker profiles works, rather than (unlike here) connecting such activities to the specific plaintiff. Roberts Decl. Ex. 8.

### E. Defendant Conceded Standing By Removing This Action To Federal Court And Availing Itself Of Federal Jurisdiction

Undermining the validity of Defendant's arguments is its conduct in this litigation. Former plaintiff Lesh did not file this action in federal court, instead proceeding in the Alameda County Superior Court. ECF No. 1-1. It was Defendant who removed this case to federal court (ECF No. 1), thereby asserting there was federal jurisdiction over this case, including Article III standing. *See*, *e.g.*, *Jones*, 85 F.4th at 573 ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction.") (cleaned up); *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *7 (S.D.N.Y. June 2, 2020) ("Defendants cannot rely on CAFA to justify the court's continued exercise of jurisdiction over the claims against them while simultaneously arguing that the court must dismiss those same claims for lack of subject matter jurisdiction."). And Defendant went further, availing itself of federal jurisdiction to (i) transfer this action from the Northern District of California to this Court (ECF No. 9), and (ii) move to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(6) (but not 12(b)(1)) (ECF No. 32). Such actions indicate Defendant believes there is Article III standing.

Defendant protests that it "promptly" brought the *Xu I* and *Insider* decisions to the Court's attention after those decisions were issued. Notwithstanding those cases are distinguishable (Argument § I.A, *supra*), the arguments available to defense counsel in *Xu I* and *Insider* were equally available to Defendant here. And it strains credulity that Defendant, represented by one of the most sophisticated law firms in the world, "missed" an Article III standing argument yet chose to argue statutory standing. *Lesh*, 767 F. Supp. 3d at 39-40. Defendant also cites to *Popa* (MTD at 7), but "*Popa* did not set forth a new rule of law—the issue of whether a privacy violation gives rise to an injury-in-fact for purposes of Article III standing is a frequent feature in these cases." *DellaSala v. Samba TV, Inc.*, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025);

*Camplisson*, 2025 WL 3228949, at *6 ("Rather than introducing new case law … *Popa* uses the same common law rules … evaluates the specific facts of that case."). Nor was *Popa* an intervening change in the law because *Popa* affirmed the district court's ruling. *United States ex rel. Godecke v. Kinetic Concepts, Inc.*, 2016 WL 11673222, at *7 (C.D. Cal. Nov. 16, 2016) ("When a purportedly intervening opinion merely clarifies the law in an area, courts typically do not conclude that an intervening change in law has occurred.").

It is true that a party never waives subject matter jurisdiction as a defense. *See* Fed. R. Civ. P. 12(h)(3). But Defendant's conduct in the litigation thus far—removing this case to federal court, availing itself of federal jurisdiction to transfer this case to this Court, and then availing itself of this Court's jurisdiction to move to dismiss on 12(b)(6) grounds—illustrates that its standing arguments lack credibility. Defendant has long conceded standing exists.

**F. To The Extent The Court Remands This Case (And It Should Not), D'Antonio Should Be Awarded Fees And Costs**

As set forth above, D'Antonio has alleged a concrete injury sufficient for Article III standing, and Defendant conceded the same through its litigation conduct thus far. Argument §§ I.A-C, *supra*. But to the extent the Court agrees with Defendant that D'Antonio lacks Article III standing (and it should not), D'Antonio should be awarded fees and costs.

"Defendant's litigation strategy smacks of forum-shopping." *Knight*, 2025 WL 346465, at *3. It was Defendant who sought to be before this Court by removing this action to federal court and then stipulating to transfer to this District (at Defendant's insistence). ECF Nos. 1, 9. Now unhappy with the Court's motion to dismiss ruling in its chosen forum, Defendant seeks a fresh start in a different forum. Even if the Court agrees with Defendant that D'Antonio lacks Article III standing (and it should not), Defendant's tactics should not be without consequence.

28 U.S.C. § 1447(c) provides that when a court remands a case to state court, it "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Such an award is proper "where the removing party lacked an objectively reasonable basis for seeking removal." *League of Women Voters of Pennsylvania v. Commonwealth of Pennsylvania*, 921 F.3d 378, 383 (3d Cir. 2019). Here, based on Defendant's conduct, either the standing arguments in Motion are without a basis, or its removal to federal court was (*i.e.*, Defendant could not have removed this case if it did not believe there was standing). If the answer is the latter, then D'Antonio (and this Court) wasted time and expense litigating this case in a forum that never had jurisdiction to begin with.

Thus, if D'Antonio lacks standing (he does not), then this case must be remanded to Alameda County Superior Court rather than dismissed. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Collier v. SP Plus Corp.*, 889 F.3d 894, 897 (7th Cir. 2018) ("Thus, § 1447(c) required the district court to remand this case to state court, because it does not satisfy Article III's requirements."). And if this case is remanded, then D'Antonio should be awarded all fees and costs incurred since Defendant's removal of this action to federal court.

## II. AS THIS COURT PREVIOUSLY HELD, D'ANTONIO PLAUSIBLY ALLEGES A VIOLATION OF CIPA § 638.51

This Court, the entire federal judiciary, and numerous state courts have found internet tracking technology similar to the Trackers here are "pen registers" within the meaning of the CIPA. *See Bradshaw*, 2025 WL 3171740, at *7 ("[T]he case law is not in Defendants' favor. Indeed, it uniformly supports the opposite outcome."). This Court has already found Plaintiff Lesh sufficiently alleged the PubMatic Tracker is a "pen register" (*Lesh*, 767 F. Supp. 3d at 38, 40-41), and other courts have found the exact Trackers at issue are likewise "pen registers." *Deivaprakash*,

798 F. Supp. 3d at 1106 (PubMatic Tracker); *Fregosa*, 2025 WL 2886399, at *1, *6 (PubMatic and ADNXS Trackers); *Xu II*, 2025 WL 3035016, at *1, *3-4 (same); *Scarlett*, 2025 WL 2614587, at *4 (ADNXS Tracker); *Echverria-Corzan*, 2025 WL 3128194, at *1 (OpenX Tracker). Defendant provides no reason for the Court to deviate from its prior holding or those of other courts.

### A. As Courts Have Held, The Trackers Did Not Record The "Contents" Of D'Antonio's Communications

Defendant argues the Trackers collect "content" and are thus not "pen registers" because they "fingerprint" users, and "any fingerprint that reveals biographical information is 'the content' of any communication between a visitor and website." MTD at 13 (cleaned up). Defendant mischaracterizes D'Antonio's allegations and ignores caselaw.

D'Antonio alleges that the Trackers record users' IP addresses, Device Metadata, and unique user identifiers, but *not* the contents of any communications. *See*, *e.g.*, SAC ¶¶ 3, 67-69, 107-108, 128-129, 259. None of this information constitutes the "contents" of any communication. *Deivaprakash*, 798 F. Supp. 3d at 1105 (finding the exact PubMatic Tracker at issue here was a "pen register" because "metadata necessarily does not constitute the content of a communication.") (cleaned up); *Fregosa*, 2025 WL 2886399, at *5 ("Device 'fingerprints' likewise serve as unique identifiers across websites and browsing sessions."); *Moody v. C2 Educational Systems Inc.*, 742 F. Supp. 3d 1072 at 1077 (C.D. Cal. July 25, 2024) ("Plaintiff's allegations that the TikTok Software gathers device and browser data plausibly fall within the scope of §§ 638.50 and 638.51."); *Heiting*, 2025 WL 736594, at *3 ("The TikTok software, which identifies users on Defendant's website by gathering their device and browser information and geographic information, among other data, is plausibly a trap and trace device under the meaning of section 638.50(c).") (cleaned up).

D'Antonio alleges that the Third Parties use the information recorded by the Trackers (*i.e.*, IP addresses, Device Metadata, unique user identifiers) to match users up to non-anonymous profiles held by the Linked Data Brokers and others, thus de-anonymizing users. *See* SAC ¶ 205 ("The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources (e.g., various data brokers) to build comprehensive profiles."); *see also*, *e.g.*, *id.* ¶¶ 74, 78, 85, 94, 113, 132-133, 140, 177-181, 214, 229, 237-238. But D'Antonio does not allege that the Trackers record entries into form fields or information D'Antonio entered directly onto the Website (*i.e.*, the "contents" of D'Antonio's communications).

This distinguishes D'Antonio's allegations from those in Defendant's cited authorities, where the plaintiffs alleged that substantive information was collected *directly* from the website (*i.e.*, the user entered information onto the website that was recorded). *Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413, at *5 n.4 (N.D. Cal. Aug. 6, 2025) ("The FAC is vague as to how a visitor's biographical information could appear on a page of the Website for Defendant's collection. The only circumstance the Court can conceive for such information to be available on a commercial website is that the visitor input that information himself.") (cleaned up); *Price v. Headspace, Inc.*, 2025 WL 1237977, at *3 (Los Angeles Super. Ct. Apr. 1, 2025) ("[T]here is no liberal construction of TikTok sending 'images' that does not amount to capturing the contents of the communication.") (cleaned up); *Casillas v. Calvin Klein, Inc.*, 2025 WL 3529009, at *1 (Los Angeles Super Ct. Nov. 25, 2025) ("[T]he TikTok picks off usernames and passwords, credit card and banking information and details about users' personal health … and it tracks … page interactions.") (cleaned up). The Court should not parrot Defendant's failure to grasp this distinction, nor should it compare the vague complaints in these cases with D'Antonio's "detailed"

SAC. *Scarlett*, 2025 WL 2614587, at *1; *Drummer*, 2025 WL 3190656, at *4 n.1 (in addressing case involving Casillas plaintiff and same plaintiff's counsel, "at least some of these state cases appear to be based on far less comprehensive complaints than those submitted by Plaintiffs").

Even if the Trackers also recorded the contents of D'Antonio's communications (and they did not), that would not be dispositive. As an initial matter, it may be that differing processes collect "addressing" information as opposed to "contents," thus not violating the statute's prohibitions. *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1155 (N.D. Cal. 2025) ("If the various functionalities within the Meta Pixel operate independently from one another, as plaintiffs plausibly allege, the process that records metadata in a pen register-like manner is a separate 'device' or 'process' from the one that collects the contents of users' communications.").

Regardless, courts confronted directly with this question have found that a tracker may still be a "pen register" even if it records both "addressing" information *and* the "contents" of a communication, so long as it does not *only* "record[] … the contents of communications." *Id.* (cleaned up); *see also*, *e.g.*, *Wiley v. Univ. Music Grp., Inc.*, 2025 WL 3654085, at *9 (N.D. Cal. Dec. 17, 2025) (rejecting argument that a "pen register" "cannot apply to devices that *also* collect the contents of a communication") (emphasis in original); *Gabrielli v. Haelon US Inc.*, 2025 WL 2494368, at *12 (N.D. Cal. Aug. 29, 2025) (same); *de Ayora v. Inspire Brands, Inc.*, 2025 WL 3707561, at *8 (N.D. Cal. Dec. 22, 2025) (same); *Drummer*, 2025 WL 3190656, at *5 (same).

### B. As Courts Have Held, The Trackers Are "Pen Registers" Because They Recorded D'Antonio's "Addressing" Information

Defendant argues that the Trackers cannot be "pen registers" because they recorded D'Antonio's own information. *See* MTD at 15 ("[I]n alleging that [D]efendant sought to de-anonymize and identify him, Plaintiff's theory of harm is unmoored from the legislature's conception of a pen register.") (cleaned up). But "[n]othing in the statutory definition limits pen

registers to those that operate the same way as a traditional phone pen register." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 at 929 (N.D. Cal. Oct. 21, 2024).

Instead, as courts have held, and as D'Antonio alleges here, "[a]ll that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [Defendant's] [W]ebsite, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Id.*; *see also*, *e.g.*, *Lesh*, 767 F. Supp. 3d at 40 (sustaining "pen register" claim where the "Trackers prompt the browser to send the user's IP address"); *Doe v. Talkiatry Management Servs., LLC*, 2025 WL 3190813, at *7 (C.D. Cal. Oct. 1, 2025) (rejecting argument that "Meta Pixel's tracking Plaintiff's own device's information falls outside the ambit of § 638.51") (cleaned up); *Camplisson*, 2025 WL 3228949, at *8 (S.D. Cal. Nov. 18, 2025) ("Plaintiffs have sufficiently alleged that the Trackers record Class members' personal information, including the addressing information contained in an IP address, and thus plausibly constitute pen registers."); *Wright v. TrueCare Property Holdings, LLC*, 2025 WL 3248749, at *4 (S.D. Cal. Nov. 21, 2025) ("Data capable of being associated with a user's identity falls within the statutory definition of addressing information."); *Greenley*, 684 F. Supp. 3d at 1050 (finding "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" was a "pen register").[6]

Defendant also argues that allegedly "downstream use of data—*i.e.*, the use of data post-collection—is not a part of the definitions of pen registers or trap and trace devices." MTD at 15 (quoting *Aviles v. LiveRamp, Inc.*, 2025 WL 487196, at *3 (Los Angeles Super. Ct. Jan. 28, 2025)).

[6] Even if Defendant is correct that a "pen register" cannot record a user's own information (and it is not), that would simply mean Defendant installed "trap and trace devices" on D'Antonio's browser rather than "pen registers," and either is sufficient to state a CIPA § 638.51 claim. *See Heiting*, 2025 WL 736594, at *3 (finding software that "identifies the source of visitors to Defendant's website" was a "trap and trace device").

*Aviles* did not cite any statutory language supporting this view, and neither can Defendant.[7] The CIPA prohibits the "install[ation] or *use* [of] a pen register." Cal. Pen. Code § 638.51(a). And D'Antonio alleges Defendant and the Third Parties used the Trackers to de-anonymize D'Antonio and sell his information *directly on Defendant's Website* by matching him to profiles using D'Antonio's IP address, Device Metadata, and unique user identifiers. *See*, *e.g.*, SAC ¶¶ 205-207, 218, 225, 234, 237-240. None of that is untethered to D'Antonio's cause of action, the information recorded by the Trackers on the Website, or some hypothetical "future" use of the information. Indeed, D'Antonio alleges such profiling and selling occurs instantaneously on the Website through real-time bidding. *See*, *e.g.*, *id.* ¶¶ 136, 188, 221.

Thus, there is no twilight between the use of D'Antonio's information, the basis for his claim, and the purview of the CIPA, which encompasses the "use" of Plaintiff's information. *See*, *e.g.*, *Fregosa*, 2025 WL 2886399, at *8 ("Mashable deliberately embedded third-party trackers on its website, knew that those trackers would capture visitors' IP addresses and device metadata, and used the resulting data in concert with Microsoft, Wunderkind, and PubMatic to facilitate targeted advertising. That active role is enough to plead use under § 638.51…") (cleaned up); *Xu II*, 2025 WL 3035016, at *3 ("Defendant argues that the conduct of Third Parties is not relevant to Plaintiff's claim against it. However, it appears Defendant does not account for Plaintiff's allegation that it was responsible for the installation of the Trackers."); *Deivaprakash*, 798 F. Supp. 3d at 1107 ("Condé ignores, however, that, as alleged by Deivaprakash, it enabled the third parties to amass information about Deivaprakash by embedding the code in its websites that surreptitiously installed the trackers on Deivaprakash's browser in the first place."); *Gilligan*, 2026

[7] *Aviles* also based its holding on legislative history and historical understandings of "pen registers," which is why courts have found it unpersuasive. *See Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *5 (N.D. Cal. Sept. 2, 2025)

WL 32259, at *2, *4 (sustaining CIPA § 638.51 claim and finding standing where "Plaintiffs allege that Experian engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity tied to their email address and other personal identifiers") (cleaned up).

### C. As Courts Have Held, Using The Trackers For Identity Resolution And Advertising Is Not "Operating, Maintaining, Or Testing" An Electronic Communication Service

Defendant argues that it is an "electronic communication service provider" (MTD at 17) that is only installing and using the Trackers to "to operate, maintain, and test its website." *Id.* (cleaned up); *see also id.* ("CNN's conduct, which enables users like Plaintiff to communicate with the website and the Internet at large, is necessary for the website to properly operate.") (cleaned up). This is wrong.

First, the scope of this exception—particularly, the purpose for installing and using the Trackers—is a question of fact not suitable for resolution at this juncture. *Garon*, 2025 WL 2522374, at *6 ("Whether Keleops uses the Trackers to operate, maintain, and test a wire or electronic communication service is a question of fact not suitable for a Rule 12(b)(6) motion, which tests the sufficiency of the pleadings.") (cleaned up).

Second, Defendant is not an "electronic communications service provider." Courts have overwhelmingly found that a defendant "does not become an 'electronic communication service' provider simply because it maintains a website that allows for the transmission of electronic communications between itself and its customers." *In re Jetblue Airways Corp. Privacy Litigation*, 379 F. Supp. 2d 299, 307 (E.D.N.Y. 2005); *see also Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 898 (S.D. Cal. 2025) (finding website operator was not "a provider of an electronic or wire communication service") (cleaned up); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024) ("Defendant fails to establish that it is a

provider of electronic or wire communication service.") (cleaned up). Indeed, courts have even found that Motorola, a cell phone manufacturer, is not an "electronic communications service provider." *Motorola Mobility*, 2025 WL 1939957, at *12. It is therefore unclear how Defendant, a news provider, would fall within this exception.

Even if Defendant were an "electronic communications services provider" (and Defendant is not), its installation and usage of the Trackers has nothing to do with "operat[ing], maintain[ing], and test[ing] a wire or electronic communication service." Cal. Penal Code § 638.51(b)(1). As D'Antonio alleges, the Trackers record more than just IP addresses (*see*, *e.g.*, SAC ¶ 3), involve having *third parties* record this information (*id.*), and are used to de-anonymize users by matching them to comprehensive profiles, which are used to generate revenue for Defendant through targeted advertising. *See*, *e.g.*, *Id.* ¶¶ 205-209 (summarizing allegations). Neither the extent of the recorded information nor the uses of the Trackers have to do with the operation, maintenance, or testing of an electronic communication service. *See*, *e.g.*, *Moody*, 742 F. Supp. 3d 1076-77 ("Plaintiff alleges that the TikTok Software recorded various other types of information such as browser and device data as well as form data. Defendant does not argue that the collection of this data is necessary to operate or maintain the Website."); *Rodriguez v. Autotrader.com*, 762 F. Supp. 3d 921 at 930 ("Nor does Defendant argue that the collection of any data by a third party is necessary."); *Motorola Mobility*, 2025 WL 1939957, at *12 ("Motorola has not established that … it collects the tracked information through the cookies to operate, maintain, and test a wire or electronic communication service.") (cleaned up); *Gilligan*, 2026 WL 32259, at *4 ("Nothing in the Complaint suggests that the third-party websites use the Tapad pixels to provide communications service or the like, or that Experian itself uses the Tapad pixels' interceptions to provide communications services or the like…"); *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL

2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("Analytics Cookies and Advertising Cookies [] are not used for billing, communication services, or similar purposes.") (cleaned up).

Defendant argues that, as the *website operator*, it "requires IP addresses and related device and browser metadata to load the CNN website on Plaintiff's browser." MTD at 17. Putting aside whether "device and browser metadata" is necessary to load a website, Defendant's argument conflates what *it* must collect versus what *third parties* must collect. *Autotrader.com*, 762 F. Supp. 3d at 930 ("Plaintiff alleges that the tracking software captured more than just her IP address … and that this information was sent to third parties, not just Defendant."). "Courts have rejected similar attempts to dismiss complaints when the allegations involved transmission of data to third parties," rather than solely a website operators' "recei[pt] [of an] IP addresses as part of an ordinary online exchange." *Fregosa*, 2025 WL 2886399, at *7; *Shah*, 754 F. Supp. 3d at 932 ("A user who consents to disclose their IP address to Fandom as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers."); *Drummer*, 2025 WL 3190656, at *4 ("Plaintiffs' Complaint is concerned with Defendant recording and transmitting their IP addresses beyond their basic use in accessing Defendant's websites.").

Several of Defendant's authorities failed to grapple with the distinction between a website operator's collection of IP addresses only versus their collection by third parties. *See* Ryu Decl. Ex. B at 7; *id.* Ex. C at 3. Others involved the collection of IP addresses only by the website operator, rather than third parties like here. *Casillas v. BOP LLC*, 2025 WL 2161288, at *2 (Los Angeles Super. Ct. June 18, 2025) ("The only specific act the FAC alleges to have been committed here by defendant is that when she used her computer to access the BOP LLC website, *Defendant* [the website operator] collected Plaintiff's IP address.") (emphasis added, cleaned up); *Casillas v. Transitions Optical, Inc.*, 2024 WL 4873370, at *4 (Los Angeles Super. Ct. Sept. 9, 2024) (identical

allegations); Ryu Decl. Ex. A at 3 ("The statute does not prohibit *a defendant* from collecting identifying information about … who is communicating with the defendant.") (emphasis added). These cases are thus unpersuasive.

**D. As Courts Have Held, The CIPA And CCPA Do Not Conflict**

Defendant argues "the California Consumer Privacy Act (CCPA) affirmatively authorizes a business to collect, use, retain, and share a consumer's personal information," and that "[c]onstruing CIPA to categorically prohibit the collection of data from website visitors would render the CCPA's provisions permitting reasonable collection of such data a nullity." MTD at 18 (cleaned up). But the CIPA does not "categorically" prohibit the collection of information website users; it simply requires users' prior consent to do so. *See Lesh*, 767 F. Supp. 3d at 43-44 (evaluating, although rejecting, Defendant's consent argument). That is no different than the CCPA. *Gilligan*, 2026 WL 32259, at *3 (finding "the CCPA does not authorize a party to intercept communications without the communicator's knowledge or consent"); *Deivaprakash*, 798 F. Supp. 3d at 1106 (finding the CCPA "provides a right to opt out from selling or sharing information and Deivaprakash expressly alleges a surreptitious collection of data; if Deivaprakash did not know about the data collection, he could not have exercised his right to opt out") (cleaned up); Cal. Civ. Code § 1798.100(a) ("[a] business that controls the collection of a consumer's personal information shall, *at or before the point of collection*, inform consumers of" the types of data collected") (emphasis added).

Thus, as courts have found, the "CCPA and CIPA are complementary." *Mirmalek*, 2024 WL 5102709, at *5; *Xu II*, 2025 WL 3035016, at *3 ("[I]t does not appear that CCPA and CIPA are in conflict with one another."); *Rose*, 2025 WL 2794920, at *4 ("The Court does not see any problem … with the overlap, if any, between CCPA and CIPA.").

Even if there were a conflict (and there is not), the CCPA states that "in the event of a

conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." Cal. Civ. Code. § 1798.175. According to Defendant, the CIPA prohibits conduct that the CCPA allegedly permits. "Thus, by Defendant's own argument, CIPA should control." *Mirmalek*, 2024 WL 5102709, at *5; *Xu II*, 2025 WL 3035016, at *3 ("Even if there was a conflict, the explicit language of the CCPA states that the law which affords the greatest protection should control. For this case, that law is the CIPA.").

Defendant cites to *Scharon v. Paramount Global*, 2025 WL 2996812 (Los Angeles Super. Ct. Oct. 3, 2025). That decision "glosse[d] over the requisite textual analysis in favor of weighing extraneous factors and, in some cases, unilaterally add[ed] modifiers to the statute." *Lewis v. Magnite, Inc.*, 2025 WL 3687546, at *13 (C.D. Cal. Dec. 4, 2025). Further, *Scharon* (i) overlooked other state and federal courts addressing the interplay between the CIPA and the CCPA; (ii) ignored Cal. Civ. Code § 1798.175 and the CCPA's prohibition on collecting information without consent; and (iii) assumed incorrectly that the CIPA implements an absolute prohibition on the collection of consumer information. Thus, *Scharon* is of little persuasive value.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Defendant's Motion in its entirety. If the Court grants the Motion in any respect, D'Antonio respectfully requests leave to amend to cure any such deficiencies.

Dated: January 20, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiff*

## WORD COUNT CERTIFICATION

I hereby certify that the foregoing Memorandum of Law contains 8,560 words, which meets the word-count limits of both L.R. 7.1(c) and Rule II.D.1 of this Court's Individual Rules.

Dated: January 20, 2026

By: */s/ Max S. Roberts*
Max S. Roberts